[Civ. No. 35.   Fourth Appellate District.—December 19, 1929.]

J. P. ARMSTRONG et al., Appellants, v. G. P. ADAMS, Respondent.

Joseph L. Lewinson and F. Walton Brown for Appellants.

G. P. Adams, *in pro. per.,* and W. W. Orme for Respondent.

SLOANE, P. J.—This is an appeal from a judgment of dismissal upon failure and refusal of plaintiffs to amend, after sustaining demurrer to their third amended complaint.

The present action was brought by plaintiffs against the defendant for damages resulting from alleged culpable negligence of defendant, as their attorney, in preparing findings in support of a judgment in favor of plaintiffs in an action to recover damages for deceit and failure of consideration in a real estate transaction.

It is alleged in the complaint in the present action that plaintiffs employed defendant to represent them and to

prosecute an action to recover damages from Walter F. Rau and Mary Rau, arising on a transaction effecting an exchange of properties; that the property received by the plaintiffs here in such exchange consisted of an orange grove and improvements thereon, situated in the county of San Bernardino; that this property was accepted in the exchange transaction on the representation that it contained 55 acres; that it was disclosed after the deal had been consummated that it only contained 44.59 acres.

That an action for damages to recover the difference in value between the property as conveyed and its value, had it contained the 55 acres as represented, was instituted against the Raus in the Superior Court of San Bernardino County. That the case was tried before the court without a jury, and proof introduced in behalf of plaintiffs that the property in question was worth $9,360 less than it would have been had it contained 55 acres as was represented, and that the court at the conclusion of the trial announced its judgment for the plaintiffs in said sum, and directed defendant here, the attorney for the plaintiffs, to prepare findings; that proposed findings were drawn up by plaintiffs' said attorney, and accepted and adopted by the court, but that said findings, as thus prepared and adopted, instead of stating that the property in question, had it contained 55 acres as represented would be worth $9,360 more than it was worth with an acreage of only 44.59 acres, stated ''that had said property embraced 55 acres, instead of 44.59 acres, the value thereof would be $9,360.00''; and that no statement of the difference in value between the property as conveyed, and as represented, was contained in the findings; that the defendants in said action appealed therefrom on the judgment-roll alone, and that on such appeal to the District Court of Appeal the judgment was reversed.

The original judgment is alleged to have been made and entered about October 7, 1922, and the judgment of reversal about April 15, 1925. The complaint also alleges that the defendant attorney wilfully, knowingly and with an intent to conceal his negligence in preparing said findings, withheld all information of the fatal omission therein, and that plaintiffs had no notice or knowledge thereof until after the judgment of reversal in the court of appeal.

The complaint states that the defect in the findings was the ground on which the court of appeal reversed the judgment. It is apparent that the findings in question were insufficient to support the judgment, and, as a matter of fact, the opinion of the court of appeal, as reported in 72 Cal. App. 288 [236 Pac. 937], shows conclusively that the judgment of reversal was based on the insufficiency of the findings. The court says: ''It is perfectly clear that the facts as found furnish no basis whatever for damages in the sum stated, or in any amount.''

Under the new section 956a of the Code of Civil Procedure and section 4¾ of article VI of the Constitution, these defects of the findings could be cured by the appellate court, but as the law then stood, and as is pointed out in the opinion, the appellate court was without authority to amend the findings, or to disregard the conclusiveness of the record as presented. No attempt seems to have been taken at any step in the proceedings to correct the error, and it does not appear whether a new trial was ever had or a recovery obtained from the defendants in that action for the damages sustained in the property exchange.

Plaintiffs' action in the present case is for damages and injuries, consequences alleged to have resulted from the negligence of plaintiffs' attorney in drafting these findings and in concealing and withholding from plaintiffs knowledge of the fatal omissions.

The complaint contains four alleged causes of action.

The first demands damages on account of the loss of interest on the judgment against the Raus, from the date of its entry, to the date of its reversal, in the sum of $2,430, and costs, which loss is alleged to have been the direct and proximate result of defendant's negligence in preparing the findings.

The second cause of action asks for the cancellation of a note and mortgage given by plaintiffs to defendant in consideration of the attorney's services, consisting in a large part of the services alleged to have been rendered valueless by the defective findings.

The third cause of action demands the cancellation of said note and mortgage under allegations that the plaintiffs were induced to execute them under the belief entertained by plaintiffs and created by the wilful and fraudulent with-

holding of information as to the insufficiency of the findings in question, to sustain plaintiffs' judgment for damages and the consequent failure of consideration for the note and mortgage, based on defendant's claim for legal services.

The fourth cause of action seeks the cancellation of the same note and mortgage by reason of alleged undue influence of defendant as the confidential attorney and advisor of plaintiffs, and their reliance on his integrity and good faith.

A general demurrer was filed by defendant to each and all of these causes of action, on the ground that neither of them or all of them together stated facts sufficient to constitute a cause of action against defendant, and also demurring specially to each cause of action on the grounds of uncertainty, ambiguity and unintelligibility, and further alleging a misjoinder of causes of action.

The demurrer to the complaint, which was plaintiffs' third amended complaint, was sustained in its entirety, and plaintiffs refusing and failing to further amend, the judgment of dismissal from which this appeal was taken was made and entered.

The correctness of the judgment of dismissal depends on whether or not either of the alleged causes of action is sufficiently pleaded. ██ Respondent concedes the rule that if any count or cause of action in a complaint setting up several counts or causes of action is good as against demurrer, that a judgment of dismissal for insufficiency of the complaint cannot be sustained. (*Jensen* v. *Dorr*, 159 Cal. 742 [116 Pac. 553]; *Brandt* v. *Brandt*, 178 Cal. 548 [174 Pac. 55]; *Jones* v. *Iverson*, 131 Cal. 101 [63 Pac. 135]; *Etchas* v. *Orena*, 127 Cal. 588 [60 Pac. 45].)

Respondent calls attention to the fact that all of the decisions cited referred to rulings on general demurrer. It will hardly be contended, whether the demurrer is general or special, that if one of several causes of action properly joined in the complaint is sufficiently pleaded, that the action as a whole can be dismissed.

In this case, each of the four causes of action is demurred to generally for want of sufficient allegation of facts, and specially on the grounds of ambiguity, uncertainty and unintelligibility. Dealing first with the special demurrer, it will be noticed that on each of the grounds stated to each of the causes of action the objection is directed solely to

the insufficiency, uncertainty, ambiguity and unintelligibility of the statement of damages. ▉ If the allegations of the complaint demurred to set forth a legal right on the part of the plaintiffs, and wrongful violation of that right by defendant and damage proximately resulting therefrom, a cause of action is stated, and it is not necessary to point out in detail in the pleadings the nature and extent of such damage, unless special damages are claimed; and if, in an attempt to do so, redundant matter is pleaded, it cannot be laid to uncertainty or ambiguity, if the essential elements of the cause are plainly presented, and show some actual damage.

We are discussing now the sufficiency of a complaint to sustain plaintiffs' standing in court and right to recovery of some sort of judgment. ▉ Under the *ad damnum* clause as general allegation of damages, a plaintiff may prove and recover those damages which naturally and necessarily result from the act complained of, and such damages need not be specially pleaded. (8 Cal. Jur., p. 887.)

"Under a general allegation of damages, a plaintiff may prove and recover those damages which naturally and necessarily result from the act complained of. These damages, the law implies, will proceed from the act, although the amount may often be in the reasonable discretion of the jury. They are called 'general' as contradistinguished from 'special' damages, which are required to be specially stated in the declaration." (*Mitchell* v. *Clarke,* 71 Cal. 163, 167 [60 Am. Rep. 529, 11 Pac. 882, 884].)

"The question as to how general damages from the breach of a contract have arisen otherwise than as disclosed by the general allegation of damages, is the subject of evidence, rather than pleading." (*Lillie* v. *Weyl-Zuckerman & Co.,* 45 Cal. App. 607 [188 Pac. 619, 620].)

▉ Considering the ruling on the special demurrer, as applied to the plaintiffs' first cause of action here, we find that each of the grounds of demurrer is based on an allegation that it cannot be determined therefrom:

"(a) How, or whether the interest of $2,430.00, which it is sought to recover, has been lost, or whether it ever will be lost.

"(b) How, or in what way plaintiffs or either of them have been damaged by any acts of defendants or of what the damage consists."

The particular allegations of the first cause of action to which these objections are addressed are as follows:

"That by reason of the failure of defendant to prepare said findings of fact in a careful and lawyerlike manner, and of the fact that the defendant caused and procured the court to sign and adopt in said action the defective and imperfect findings which were prepared by defendant in his capacity as attorney for plaintiffs in said action as aforesaid, plaintiffs have incurred loss and damage, in that said judgment rendered in said action against Walter F. Rau and Mary Rau, was reversed by said District Court of Appeal, and plaintiffs have lost the benefit thereof; that plaintiffs have lost the interest which accrued in said judgment up to the time of the reversal thereof, and would have accrued thereon from said time to the time when a new trial of said action could have been had, to-wit: as plaintiffs are informed and believe and therefore allege, on or about the first day of July, 1926, amounting to the sum of Two thousand four hundred thirty dollars ($2,430.00), to the damage of plaintiffs in the sum of Two thousand four hundred thirty dollars ($2,430.00)."

Whatever defense might be made to the measure of damages herein set forth, there cannot be said to be a failure to allege damage from the negligent acts of defendant, nor that there is anything ambiguous, uncertain or unintelligible in the allegations; and it cannot be contended that the allegations of fact leading up to the reversal of plaintiffs' judgment fails to show that the reversal of such judgment, under the circumstances set forth, caused damage to plaintiffs sufficient to sustain a judgment in some amount, if shown to be the result of defendant's negligence and breach of duty. We reach the same conclusion as to the sufficiency of the first cause of action against the general demurrer.

The remaining and important question is, was there actionable negligence on the part of defendant in failing to properly prepare the findings in the damage suit, in which he was acting as attorney for the plaintiffs?

We are satisfied that under the facts pleaded, which for the purpose of considering the ruling on demurrer must be

accepted as true, the defendant is liable for any damages proximately resulting from the fatal omission in the findings. The general rule as to liability of attorneys for their clients is stated in 3 California Jurisprudence, page 670, section 73, as follows:

"The law implies a promise on the part of an attorney, that he will execute the business entrusted to his professional management, with a reasonable degree of care, skill and dispatch, and the attorney is liable for a violation of this obligation, provided damage results therefrom."

This rule calls for at least ordinary skill and care in the course of the attorney's professional employment. This rule is stated in *Gambert.* v. *Hart,* 44 Cal., at pages 542, 552, as follows:

"The rule firmly established in this country by the weight of authority is that an attorney is bound to use ordinary skill and care in the course of his professional employment.

"In the late work of Shearman & Redfield on Negligence, section two hundred and twelve, it is said: 'The true rule of liability undoubtedly is that an attorney is liable for a want of such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise.' This is the principle recognized in *Wilson* v. *Russ,* 20 Maine, 421 [50 Am. Dec. 386]; *Goodman* v. *Walker,* 30 Ala. 482 [68 Am. Dec. 134]; *Cox* v. *Sullivan,* 7 Ga. 144, and numerous American cases, and, we think, is not only established by authority, but is founded in reason and justice."

It may be conceded that where the mistake or omission of the attorney arises from controvertible interpretation of law, or some uncertainty or ambiguity of fact, the rule for liability for damages may not be strictly applied, but in this case, the mistake and omission complained of was obviously as to the most important part of the case, the finding of the amount of loss sustained by plaintiff from the difference in acreage between the tract of land conveyed, and as it had been represented. This difference in value was the main issue in the case, and the amount of recovery given by the judgment was to be determined by it.

It is the last thing that should have been overlooked in preparing the findings.

Whether the failure to make such finding was the result of culpable negligence, want of skill or mere indifference, it

was, from the standpoint of liability, inexcusable. The same is true if it was a mistake of the stenographer, which was overlooked by the defendant, as would appear likely from the wording of the finding.

Counsel for defendant do not very confidently question the liability of an attorney where there is responsibility for such an error as this. They, rather, try to place the ultimate blame on the judge who adopted and signed the findings. This position cannot be maintained. It is true that the findings became the findings of the court, but section 634 of the Code of Civil Procedure, recognizes the right of the court to direct a party to prepare and submit findings, and it is the accepted practice to leave it to the attorneys for the successful party to draft and submit findings. While it is, of course, the duty of the court before signing findings of fact and conclusions of law to see that they state the facts and conclusions as approved by the court, it will, however, not do to release the attorney from responsibility to his client for a mistake or oversight of the court, which has been induced by an error of the attorney. It cannot be claimed in this instance that the finding as made may have been the finding intended by the court, because the amount of recovery given in the judgment is the precise amount calling for the omitted finding, and dependent upon such finding to sustain the judgment.

The mistake was one for which the defendant was primarily responsible. It resulted in the reversal of plaintiffs' judgment, and presumptively to their damage.

We are of the opinion that the demurrer to the complaint in this action, at least as to the first cause of action, should have been overruled, and that the judgment of dismissal was erroneous. As this finding will necessitate a reversal and new trial, we do not deem it necessary to consider the sufficiency of the other causes of action as pleaded, since the pleadings will be open to further consideration and amendment if necessary, in the trial court.

The demurrer on the ground of misjoinder of causes of action is not well taken for the reason that the ground of relief demanded in each arises from the same transaction, namely, the employment by plaintiffs of the defendant as their attorney, his actionable negligence in this matter, and his alleged fraudulent concealment of the consequences of

his act from the plaintiffs. (Code Civ. Proc., sec. 427, subd. 8.)

The judgment is reversed.

Barnard, J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 13, 1930, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 17, 1930.

Shenk, J., dissented.

[Civ. No. 7286. First Appellate District, Division One.—December 20, 1929.]

F. E. BOOTH COMPANY, INC., et al., Petitioners, v. I. ZELLERBACH et al., Respondents.

B. D. Marx Greene and Carl Westerfeld for Petitioners.

Eugene D. Bennett, Wm. B. Hornblower and Fabian D. Brown for Respondents.

THE COURT.—Petitioners herein prayed for an alternative writ of prohibition, directed to I. Zellerbach, George B. Clarkson and Reginald G. Fernald, as and constituting the Fish and Game Commission of the state of California, and all persons acting by and through said respondents herein, directing and commanding the said respondents and each of them, their officers and agents to desist and refrain from issuing to Globe Grain and Milling Company any permit to take and use fish by a reduction or extraction process for the manufacture of edible products, and to show cause before the above-entitled court why the said I. Zellerbach, George B. Clarkson and Reginald G. Fernald, their officers and agents, should not be absolutely and forever restrained from taking any further or other proceedings toward granting such permit to Globe Grain and Milling Company to take and use fish by a reduction or extraction process for the manufacture of edible products, and for such other and further relief as petitioners may be entitled to.

Respondents have appeared and demurred and answered to the petition. ■ They claim that the granting of the permit to said Globe Grain and Milling Company, or to any other person, is not a judicial function, being purely an administrative or executive act to which the writ of prohibition will not run, and is in no way reviewable in this proceeding. ■ Respondents also contend that the permit authorizing them to act had been granted prior to the issuance of the alternative writ and for which further reason the writ will not lie.

We are of the opinion that respondents are correct in their contentions. (*Globe Cotton Oil Mills* v. *Zellerbach, etc.*, 200 Cal. 276 [152 Pac. 1038]; Code Civ. Proc., sec. 1102; 21 Cal. Jur. 591.)

The petition is denied and restraining order discharged.

[Crim. No. 1556.   First Appellate District, Division One.—December 20, 1929.]

THE PEOPLE, Respondent, v. RUFO SOTELO, Appellant.

John A. Murphy and Ed. J. Clark for Appellant.

U. S. Webb, Attorney-General, and Lionel Browne, Deputy Attorney-General, for Respondent.

TYLER, P. J.—Appellant was charged in an information filed by the district attorney of Monterey County with the crime of murder, for the killing of one Bartoleme Cabaltera. A verdict of murder in the second degree was returned by the jury. Motion for a new trial was made and denied. From the judgment entered upon the verdict and from the order denying a new trial appellant prosecutes this appeal.

The main point relied upon for a reversal is that the evidence is insufficient to support the verdict. Defendant and the deceased, Filipinos, were employed in a camp in the vicinity of the town of Spreckels, Monterey County, California. Deceased was the cook at the camp and defendant, so he testified, visited him for the purpose of collecting a certain sum of money which he claimed the deceased owed him. What transpired between them was testified to by defendant, who took the stand in his own behalf. In substance he claimed that upon demanding payment of the sum due him deceased became angry, denied the indebtedness, and commenced throwing stove-wood at him, which struck him on certain parts of his head and body. After throwing the wood, deceased attempted to obtain possession of an iron poker with which to strike defendant, whereupon defendant, in order to protect himself, stepped toward the deceased and threw a knife at him which penetrated his back, producing a wound which shortly thereafter caused death. There were no eye-witnesses to the killing and defendant claims that as his testimony was not directly contradicted the jury was bound to accept it and should have acquitted him. There were other circumstances, however, from which the jury was fully justified in rendering the verdict which it did. It appeared in evidence that deceased ran from the kitchen with the knife in his back, calling for help, and that he was closely followed by the defendant. Defendant ran away from the scene of the killing, and, in the course of his flight, threw away a loaded revolver. He afterward concealed himself, but was subsequently arrested in an adjacent town.

The knife with which the killing was done entered the back of the deceased between the third and fourth ribs for a depth of about six inches. It was the claim of the prosecution that it would have been impossible for the knife to have produced this character of a wound under the circumstances described by defendant, or that it could have penetrated the body of the deceased to the depth that it did. It was the theory of the prosecution that defendant had approached the deceased while he was bending over his stove and deliberately stabbed him. Defendant admitted that at the time the wound was inflicted the deceased had his back turned toward him. The nature and character of the wound and the fact that the knife remained embedded in the back of the deceased, together with the other circumstances above related, were legitimate matters to be considered by the jury in reaching its conclusion. ■ The mere fact that defendant's testimony was not improbable and was uncontradicted by direct testimony, did not compel the jury to believe it, where the circumstances were such as to reasonably justify an inference of guilt. (*People* v. *Neary*, 104 Cal. 373 [37 Pac. 943].) As was said in *People* v. *Hall*, 87 Cal. App. 634 [262 Pac. 50], few criminals would ever be convicted if their explanations were always accepted as gospel truth.

■ Appellant next complains of the giving and refusal to give certain instructions to the jury. These instructions relate to the question of flight by a defendant immediately after the commission of a crime, as tending in some degree to prove a consciousness of guilt, and also to the questions of self-defense and circumstantial evidence. We have read the instructions carefully. The jury was fully and fairly instructed upon these questions and we find no error in this connection. ■ And, finally, appellant complains of the action of the trial court in refusing to grant a new trial. When the motion came on for hearing there was offered in evidence two affidavits of members of the jury which appellant claims show that the jury was guilty of misconduct during its deliberation. The misconduct relates to the fact that certain of the jurors consulted law books which were in the jury-room to ascertain the meaning of the term "malice aforethought." After reading the same there was still a difference of opinion among the jurors as to the mean-

ing of the term, and the jury asked for and received further instruction upon the subject. Under these circumstances it is apparent that the defendant was not prejudiced by the action of the jurors. In and of itself the consulting of law books by members of the jury has been repeatedly held not to constitute error. (*Durham* v. *State,* 70 Ga. 264; *People* v. *Draper,* 28 Hun (N. Y.), 1.) ▮ Moreover, the general rule is that jurors are not permitted to impeach their own verdict by their affidavits showing misconduct on the part of its members, except where the verdict is reached by a resort to the determination of chance, and this is particularly so where the misconduct has been submitted to the trial court and passed upon by that tribunal, as the law is settled that the appellate court will not disturb an order denying a motion for a new trial on the ground of misconduct, unless there is manifestly and clearly an unmistakable abuse of discretion. (*People* v. *Maggio,* 90 Cal. App. 683 [266 Pac. 813].)

The judgment and order are affirmed.

Knight, J., and Cashin, J., concurred.

[Civ. No. 3863. Third Appellate District.—December 20, 1929.]

IRA D. PYLE et al., Respondents, v. WILLIAM E. BENJAMIN, Appellant.

Bryce Swartfager and Harry T. Kyle for Appellant.

Wallace L. Ware and George W. Murphy for Respondents.

JAMISON, J. *pro* *tem.*—Respondents, as real estate agents, recovered judgment against appellant for $600, $500 of said judgment being for commission on the exchange of real estate and $100 for attorney's fees. From this judgment appellant has appealed.

It appears from the evidence that about the first day of October, 1926, appellant called on respondents at their office and told them that he had a tract of land which he desired to sell or exchange. Through the efforts of respondents a party was found, a Mr. Fred C. Feltz, who was willing to exchange some land he owned for that of appellant, and

thereafter, on October 25, 1926, appellant and said Feltz entered into a contract for the exchange of certain tracts of land owned by each, respectively, the exchange to be completed by November 1, 1926. Thereafter, a new contract was entered into between them, extending the time for completing the exchange to November 15, 1926. By the terms of these contracts respondents were made the joint agents of appellant and Feltz in the said matter of exchange, and it was therein provided that upon both appellant and Feltz signing the contracts, they would pay respondents a commission of $800, appellant's share thereof to be $500, and Feltz's share to be $300; with the further provision that if either of the parties to said contracts refused to complete or consummate the contracts or any part thereof, the party so refusing should pay said agents $100, as liquidated damages for services rendered. The said contracts also contained a provision that in the event of a suit to enforce the collection of the commission, the party in default should pay an attorney fee of $100. The new contract also provided that the exchange was to take place on or before November 15, 1926, giving sufficient additional time to remove defects in the title, if any, to the property to be exchanged, and providing that if such defects were not so removed or adjusted, then the party at fault should pay the said commission as agreed. The new contract was signed by respondents and appellant on November 9, 1926, and upon the following day each of them executed deeds to the other for the land to be exchanged, and said deeds were placed in escrow with the Sonoma County Abstract Bureau, to be recorded after the title to the property of each party had been corrected. Feltz testified that on November 13, 1926, appellant called on him at the office of respondents, and asked him for the key to the property that Feltz had deeded to him, stating to Feltz that he would visit this property the next day, and would take with him, to look at said property, a party to whom there was a prospect of trading same. Feltz delivered the key to appellant, but it was never returned to him. Respondent Wright testified that he was present on November 13, 1926, when the key was delivered to appellant; that on November 14, 1926, appellant telephoned him that he would call the deal off; that he was not going through with it; and from said last-

named date refused to carry through the deal for the exchange of said property; that appellant gave as his reason for said refusal, that the Feltz property was too cold, too many shade trees upon it. Appellant testified that he did not change his mind about the deal until November 16, 1926, and that the reason he changed his mind and refused to go ahead with the deal was because he learned that the $5,000 mortgage or deed of trust he was to assume called for eight per cent interest instead of seven per cent.

Appellant assigns as error the finding of the court that upon the signing of the contract by appellant and the said Feltz, appellant agreed to pay respondents the sum of $500. He contends that if any liability attaches by virtue of the contract, that liability would be the sum of $100 instead of $500, for the reason that it is provided in said contract that the party who refuses to complete the said contract shall pay to the agents the sum of $100 as liquidated damages for the services rendered. Section 1670 of the Civil Code declares that contracts wherein the amount of damage to be paid for breach of the obligation, is determined in anticipation thereof, are void to that extent except as provided in section 1671 of said code, and this latter section provides that parties to the contract may agree upon the amount of the damages when from the nature of the case it would be impracticable or extremely difficult to fix the actual damages. In the case of *McInerney* v. *Mack*, 34 Cal. App. 153 [166 Pac. 867, 868], the court said: "In such action as this, as a matter of defense, defendant must show to the court by proper pleadings and competent proof that the contracts fall within the law permitting liquidated damages. This does not depend entirely upon the contract itself. Facts must be pleaded and proven from which the court can say as a matter of law that the contract for liquidated damages is valid because from the nature of the case it would be impracticable or extremely difficult to fix the actual damage." (*Sherman* v. *Gray*, 11 Cal. App. 348 [104 Pac. 1004]; *Long Beach etc. Dist.* v. *Dodge*, 135 Cal. 401 [67 Pac. 499]; *Sunmaid Raisin Growers of California* v. *Paul A. Mosesian & Son*, 90 Cal. App. 1 [265 Pac. 828]; *Hanlon Drydock etc. Co.* v. *McNear*, 70 Cal. App. 204 [232 Pac. 1002].)

In the case under consideration the defendant has wholly failed to disclose, either by pleading or proof, anything to bring this alleged defense within the provision of the said section 1671 of the Civil Code. For the purpose of determining whether or not "from the nature of the case it would be impracticable or extremely difficult to fix the actual damage," the court must examine the attendant and surrounding circumstances under which the contract was entered into as well as the terms of the contract itself. (*Pacific Factor Co.* v. *Adler*, 90 Cal. 110 [25 Am. St. Rep. 102, 27 Pac. 36].) By the terms of the contract which they each signed, the appellant and Feltz both agreed that the value of the service of respondents in bringing the deal to the point where both parties signed the contract for the exchange was the sum of $800. There could be no uncertainty as to the amount of damages respondents would sustain by the refusal of either of the parties to said contract to carry out and perform it after signing same. By the very terms of the contract respondents were entitled to receive from the contracting parties the full commission of $800 upon the signing of the contract. It therefore clearly appears that the attempt to fix the damage respondents would suffer by the failure or refusal of appellant or Feltz to complete the contract would not fall within the provisions of said section 1671 of the Civil Code, but that it does fall within the provisions of section 1670 of said code.

Appellant next contends that respondents' cause of action is barred by section 1559 of the Civil Code, upon the theory that the contract having been made for the benefit of respondents, they not being parties thereto, it was rescinded before this action was commenced. The said section 1559 is as follows: "A contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." Section 1689 of the Civil Code sets forth the conditions under which a party to a contract may rescind it. These conditions are contained in five subdivisions of said section. Appellant does not indicate in his brief under which of those subdivisions the alleged rescission resulted. He simply states that the contract of exchange was rescinded before November 25, 1927, the date this action was commenced, and that this rescission was effectuated by the open, mutual aban-

donment of the contract, made manifest by the conduct and action of the parties.

The court found that at the time said contract was executed, and for many months subsequent thereto, the said Feltz was ready, able and willing to make the exchange, and to perform all the terms and covenants of said contract, agreed by him to be performed, but that on the fourteenth day of November, 1926, appellant refused, and ever since then has refused to make the exchange, or to perform any of the terms, covenants and conditions of said contract which he agreed to perform, and this finding is supported by substantial evidence. Appellant never at any time gave any notice of the rescission of said contract. He admits that he told respondent Wright, on November 18, 1926, that he would not carry out the contract, and had his attorney, on November 30, 1926, appear at the office of the Sonoma County Abstract Bureau, with whom his deed was deposited in escrow, and mark across the face of said deed the word "canceled." He claims, however, as justifying his repudiation of the contract, that Feltz had not removed all defects from the title to the land which Feltz was deeding him, as by the terms of said contract Feltz was required to do. Admitting that this was true, yet the contract, while providing that the time limit was November 15, 1926, also provided that either of said parties was given sufficient additional time to remove such defects, and, therefore, neither of them could have been in default under said contract until at least a reasonable time for removing the defects had expired. ■ Then again, the trial court having found, upon substantial evidence, that appellant, on the fourteenth day of November, 1926, which was prior to the time limit named in the contract, had breached and repudiated it by refusing to carry out its terms, and had so notified the said Feltz through his agent, the said Feltz was under no obligation to continue to perform his obligations thereunder. (Sec. 1440, Civ. Code; *Donlon* v. *Meyer,* 35 Cal. App. 225 [169 Pac. 447]; *Mulborn* v. *Montezuma Imp. Co.,* 69 Cal. App. 621 [232 Pac. 162].) There is no evidence upon which appellant can base the claim that the contract was rescinded. Respondents did not rescind it, or in any way attempt to do so. ■ Even had appellant attempted to rescind the contract, he could not have done so after he

breached and repudiated it. The rule is general that the right to rescind a contract rests only with the party who is without default. (*Fairchild etc. Co.* v. *Southern etc. Co.,* 158 Cal. 264 [110 Pac. 981]; *California Sugar .etc. Agency* v. *Penoyar,* 167 Cal. 274 [139 Pac. 671]; *North American Co.* v. *Outer Harbor Co.,* 178 Cal. 406 [173 Pac. 756].)

There is no merit in the contention of appellant that the court erred in overruling his demurrer.

The judgment is affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

[Civ. No. 3921. Third Appellate District.—December 20, 1929.]

L. F. INGLEDUE, Appellant, v. L. DAVIDSON, Respondent.

H. T. Morrow and Hyams & Himrod for Appellant.

Gibson, Dunn & Crutcher and Norman S. Sterry for Respondent.

JAMISON, J., *pro tem.*—Appellant brought this action to recover damages for injuries sustained by him from an explosion of gas. From a judgment rendered in favor of respondent upon a directed verdict he has appealed. It appears from the evidence that on the sixth day of May, 1922, appellant went to respondent's restaurant about noon for a lunch. He had made his order and was sitting on a stool at the lunch-counter facing a large mirror that was attached to and rested against the wall some six feet in front of and to the west of him. This mirror was from twenty-five to thirty feet long and about six feet wide and rested upon a shelf, the bottom of the mirror being about six inches higher than the lunch-counter, the space between the shelf and the lunch-counter being used by the waiters in passing back and forth while waiting upon the lunch-counter customers. Immediately south of the south edge of said mirror and twelve or fourteen inches therefrom was a coffee urn, which was heated by a small gas jet. Shortly after appellant had taken his seat at the lunch-counter, and while waiting for his order to be filled, a small flame, several inches wide and a few inches high, shot up from the south edge of the mirror, which increased in size until it was six or eight inches high. A passing waiter struck at it with a cloth or with his hand and this having no effect upon it, he started to get some water to pour on it. Just then an explosion took place that forced the mirror from its place and it fell for-

ward on the lunch-counter. Appellant was thrown from his seat on the stool to the floor and suffered injuries that sent him to the hospital and that confined him to his bed for several weeks and compelled him to expend sums for physician's, nurse's, hospital and other bills.

It appears that immediately behind the mirror and concealed from observation by it was a gas-pipe, one-half inch in diameter, that was not being used for any of the purposes of the restaurant at the time of the explosion. This pipe was eight or ten feet long and had an ell at the upper end that extended toward the back of the mirror. The lower end connected with the main in the basement that furnished gas to the restaurant and it had no cut-off that would prevent the flow of gas into it when gas was turned on for the use of the restaurant. The upper end of this unused gas-pipe extended from four to six inches above the level of the shelf upon which the mirror rested and this pipe was between the mirror and a brick wall, but not imbedded in the wall.

Appellant knew of the existence of this pipe, at least to the extent of knowing that it connected with the main house pipe in the basement, although it is not shown that he knew that it extended up to the point behind the mirror.

Immediately after the explosion a flame several inches high was seen coming from this unused pipe and this flame continued to burn until the gas was cut off from the restaurant.

It appears from the evidence that the gas which caused the explosion came from this unused pipe, which was either not plugged or so insecurely plugged that it permitted gas to escape from it. There was a brick wall behind the mirror and behind this pipe which had pockets in it, were places where brick had been left out, or from which they had been removed, and these pockets apparently had become filled or partly filled with this leaking gas, and some of this gas found its way along and outside of the edges of the mirror and became ignited and this ignition was communicated to the gas in the pockets and thereupon the explosion ensued.

Respondent had occupied the premises in which he was conducting the restaurant since December 20, 1920, and at the time of the explosion was occupying said premises as lessee under a lease which provided that he should keep the leased premises in good order and condition at his own expense. The unused pipe had been placed in said leased

premises before the occupancy thereof by appellant, and prior to the explosion had not been used by him.

Respondent testified that his weekly gas bill from the first of the year until the week ending March 20th of that year ran from $36.20 to $39.92; that for the week ending on March 20th the bill was $42.12 and thereafter his weekly gas bills increased until on May 1st it was $45.90. He also testified that the defendant, the Los Angeles Gas and Electric Corporation, was furnishing the gas for his restaurant, that during the latter part of March he complained to the gas company regarding the increase in his gas bills and was requested to file a complaint; that in April, 1922, he called at the office of the gas company and stated to its employee he found there that he was having the highest gas bills he ever paid, that he did not see any reason why this should be the case, that he did not know what was the matter, that said employee suggested that there might be water in the meter, that the next day an employee of the gas company came to the restaurant and changed the meter.

The gas bill, after the meter was changed, was still more, that on Tuesday or Wednesday before the following Saturday, the day upon which the explosion took place, respondent again called at the office of the gas company and said to the employee in charge of the office, "I know there is something wrong there somewhere and I wish you would send someone down and find out what it is." On Thursday preceding the explosion, two employees of the gas company came to the restaurant and started to take the meter out. Respondent told them to wait until he called up the office of the gas company. He then stated to the employee who answered on the telephone that he didn't want another meter, but wanted someone to come down and investigate the matter. The employee asked him if he did not want the meter, and when respondent informed him that he did not want it, the employee said something that sounded to respondent like an invitation to betake himself into the realms of Pluto.

Appellant produced as a witness Harry J. Griffin, captain of the fire department of Los Angeles, who testified that he went to the place of explosion, that when he arrived there he saw the mirror lying on the lunch-counter and a flame coming from the gas-pipe that stood behind where the mirror had been, that he immediately had the gas that supplied the

restaurant shut off, that he saw respondent there and asked him what he thought caused the explosion and that respondent replied that he had been smelling gas around there for four or five days and had been trying to get it fixed.

■ Appellant was an invitee on the premises of respondent at the time of the explosion. The owner or occupier of a building must exercise ordinary care to render the premises reasonably safe to persons whom he induces to come thereon by invitation, express or implied. (Thompson on the Law of Negligence, p. 146.) And, as such invitee, respondent owed appellant the duty of maintaining the property in a safe condition and of exercising reasonable care in protecting him from injury. (*Madigan* v. *O. H. Hale & Co.*, 90 Cal. App. 151 [265 Pac. 574]; *Goldsteen* v. *Healey*, 187 Cal. 206 [201 Pac. 462]; *Giannini* v. *Campodonico*, 176 Cal. 548 [169 Pac. 80]; *Oles* v. *Kahn Bros.*, 81 Cal. App. 76 [253 Pac. 158].)

. ■ There was evidence on the part of plaintiff that for some time before the explosion respondent knew that something was wrong with the gas that was being furnished to his restaurant; that for some unaccountable reason his gas bills were increasing. He had the meter changed and still the increase continued. As a cause for the explosion he stated to the captain of the fire department that he had smelled gas for four or five days prior to its occurrence. He did not have his gas-pipes examined to ascertain from what source the smell of gas came, though he must have known that this continuing odor of gas indicated a leakage, but continued to have the gas turned on though he must have realized that a continual leakage of gas would likely result in an explosion.

In the case of *Perera* v. *Panama-Pacific Int. Expos. Co.*, 179 Cal. 63 [275 Pac. 454], the court said: ''It is now settled that the right of a court to direct a verdict is, with regard to the condition of the evidence, absolutely the same as the right of a court to grant a nonsuit; and also that a court may grant a nonsuit only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff.'' (See, also, *Burgesser* v. *Bullock's*, 190 Cal. 673 [214

Pac. 649]; *McCarthy* v. *Pacific Elec. Ry. Co.*, 82 Cal. App. 503 [255 Pac. 868].)

And in this last-named case, the court said that the rule as to directed verdicts is not that a verdict may be directed whenever the evidence is such that upon motion the court would grant a new trial. For a court may grant a new trial, even when there is substantial evidence to sustain the verdict, if it believes the evidence preponderates against the verdict, but applies only when the evidence is wholly insufficient to support the verdict, and where upon the whole evidence the court, of its own motion, would be compelled to set the verdict aside as unsupported by the evidence.

From the foregoing facts the jury could have been warranted in the belief and inference that prior to the explosion the respondent was put upon notice that there was a leakage in his gas-pipe or pipes and that his failure to cause an examination of his gas-pipes and the stoppage of such leak and the continued use of the gas in his restaurant while such condition existed were the proximate causes of the explosion.

We are of the opinion that the evidence tending to prove that the explosion was caused by the negligence of the respondent was sufficiently substantial to require the submission of the case to the jury.

Appellant claims that the doctrine of *res ipsa loquitur* applies to the facts of this case. In his complaint he does not plead negligence in general terms, but sets out the specific acts of respondent upon which he bases his allegations of negligence. By so doing, he has barred himself from relying upon this principle of the law. The general rule is that where the plaintiff in his complaint gives the explanation of the cause of the action, that is to say, where the plaintiff, instead of relying upon a general allegation of negligence, sets out specifically the negligent acts or omissions complained of, the doctrine of *res ipsa loquitur* does not apply. (*Connor* v. *Atchison etc. Ry. Co.*, 189 Cal. 1 [26 A. L. R. 1462, 207 Pac. 378]; *Marovich* v. *Central Cal. Traction Co.*, 191 Cal. 295 [216 Pac. 595].)

The judgment is reversed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 18, 1930, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 17, 1930.

All the Justices present concurred.

[Civ. No. 3925.   Third Appellate District.—December 20, 1929.]

L. F. INGLEDUE, Appellant, v. L. DAVIDSON et al., Defendants; LOS ANGELES GAS & ELECTRIC COR-PORATION (a Corporation), Respondent.

H. T. Morrow and Hyams & Himrod for Appellant.

Paul Overton, S. W. Guthrie, Samuel Poorman, Jr., and Douglas Van Dyke for Respondent.

704

JAMISON, J., *pro tem.*—Respondent is one of the defendants in the case of L. F. Ingledue, plaintiff and appellant, *v.* L. Davidson, doing business under the fictitious name and style of Pulman Lunch, defendant and respondent, D. W. Edelman et al., defendants, in which a decision was this day rendered (*ante*, p. 697 [283 Pac. 837]). At the close of plaintiff's evidence in that case, the trial court granted a motion for nonsuit in respondent's favor. From this action of the court plaintiff has appealed.

The facts applying to this case are set forth in the aforesaid decision. It appears from these facts that at no time prior to the explosion had this respondent received any notice that there was any leakage of gas from any of the gas-pipes on the premises of defendant Davidson, nor information sufficient to put respondent upon notice that such leakage existed.

Nor can the doctrine of *res ipsa loquitur* be invoked against this respondent for the reason set forth in said decision and for the additional reason that the pipe, the leaking from which caused the explosion, was a part of the house piping of the said Davidson restaurant and not under the actual control of this respondent.

The trial court did not err in granting the motion for nonsuit.

The judgment is affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 17, 1930.

All the Justices present concurred.

[Crim. No. 1883. Second Appellate District, Division Two.—December 20, 1929.]

THE PEOPLE, Respondent, v. J. P. PHILLIPS, Appellant.

Frederic H. Vercoe, Public Defender, Franklin Padan, Chief Deputy Public Defender, and Richard F. Bird, Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, and W. R. Augustine, Deputy Attorney-General, for Respondent.

THOMPSON (IRA F.), J.—By an information filed on December 21, 1923, by the district attorney of Los Angeles County the defendant was charged with the crime of forgery, alleged to have been committed on December 11, 1923. The defendant interposed a plea of "not guilty" and also one of "not guilty by reason of insanity." His trial was set for February 11, 1924, but he absconded and was not re-apprehended until April 29, 1929. His trial upon the first plea came on for hearing on July 25, 1929, and on the second plea, on the day following. The jury returned a verdict of guilty and also found the defendant sane. The court denied his motion for a new trial and he is here upon

an appeal from the judgment and from the order refusing to vacate the verdict.

The appellant raises but one question. During the first trial he offered testimony to show that his mental condition was subnormal, it being the contention of his counsel that there is ''between the state where a person is normal mentally and the state where he is legally insane, a fixed twilight zone where he is neither insane nor normal mentally.'' This proof was tendered ''for the purpose of showing that he was in such a state of mind he did not entertain an intent to defraud, which is the gist of the crime on which'' the appellant was being tried. The quotations are taken from the offer of proof of counsel during the trial and clearly and succinctly set forth the theory he had in mind. And perhaps the question here will be made more clear if we also set down an excerpt from appellant's brief which concisely states the proposition, as follows: ''The trial court erred in refusing to allow appellant to introduce evidence at his trial on his plea of not guilty regarding his subnormal condition, not amounting to insanity as affecting the question of the intent or lack of intent with which the alleged criminal act was committed.''

Counsel for appellant, while recognizing the force of the opinion in *People* v. *Troche*, 206 Cal. 35 [273 Pac. 767], attempt to distinguish the instant cause therefrom. Their argument is plausible and earnest, but without substance, as a few references to the language of that decision will demonstrate. It is there said: ''The arguments touching the validity of these provisions have been advanced from three points of view: First . . . second, that, when properly construed, the statute eliminates from the consideration of the jury during the trial of the general issue the question of the 'legal insanity' of the defendant—the only kind of insanity which excuses one from punishment for a crime committed—but does not prevent the introduction of evidence tending to establish the mental condition of the accused at the time the offense was committed, *for the purpose of showing a lack of criminal intent,* malice, or premeditation, such evidence to be also considered by the jury, in the exercise of its discretion in a trial for murder, in fixing the degree of the crime and the punishment at life imprisonment or the extreme penalty, if it finds the offense to have

been murder in the first degree; . . . " (Italics ours.) In our opinion the words of the Supreme Court constitute a re-statement of the proposition advanced by the appellant. We can scarcely imagine two arguments more nearly the same when relating to a subject as new to the profession. How does the court answer? In these words:

"The trial court committed no error in strictly following the letter of the statute (Pen. Code, secs. 1020 and 1026) and excluding, on the trial of the general issue of not guilty, all evidence tending to show the mental condition of the defendant at the time of the commission of the offense. The doctrine of 'partial insanity,' announced by some authorities, particularly Wharton in his work on Criminal Law, has never been recognized as the law in this jurisdiction. In this state, in order that 'insanity may be available as a defense to a crime charged, it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed. If he has reasoning capacity sufficient to distinguish between right and wrong, as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct. Although he may be laboring under partial insanity, as, for instance, suffering from some insane delusion or hallucination—still, if he understands the nature and character of his action and the consequences —if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts.' (*People* v. *Willard,* 150 Cal. 543, 554 [89 Pac. 124]; *People* v. *Kerrigan,* 73 Cal. 222, 225 [14 Pac. 849]. See, also, *People* v. *Hurtado,* 63 Cal. 288.) In this state 'so far as accountability to the law is concerned, there is no middle ground.' (*People* v. *Perry,* 195 Cal. 623, 639 [234 Pac. 890].) Such is the law in many jurisdictions. (*Warner* v. *State,* 114 Ind. 137 [16 N. E. 189]; *United States* v. *Lee,* 4 Mackey (D. C.), 489 [54 Am. Rep. 293]; *Commonwealth* v. *Wireback,* 190 Pa. St. 138 [70 Am. St. Rep. 625, 42 Atl. 542]; *Dean* v. *State,* 105 Ala. 21 [17 South. 28]; *Wartena* v. *State,* 105 Ind. 445 [5 N. E. 20];

*Kirby* v. *State,* 68 Tex. Cr. Rep. 63 [150 S. W. 455].) 'Protection is always afforded in courts of law to persons of unsound mind. Distinction is made between sanity and insanity in people, but not as respects their grade of intelligence. The law does not attempt to measure degrees of intellect, nor to make distinction with respect thereto, where the power of thought and reason exists.' (*State* v. *Schlaps,* 78 Mont. 560 [254 Pac. 858, 863].) In 14 R. C. L., page 599, section 54, it is said: 'It is the general rule that insanity, when interposed as a defense in a criminal prosecution, is either a complete defense or none at all, and it has been held that there is no degree of insanity sufficient to acquit of murder but not of manslaughter.' A valuable note on this subject is found in the case of *Knights* v. *State,* 76 Am. St. Rep. 83 [58 Neb. 225, 78 N. W. 508].

"It follows, therefore, that any evidence tending to establish the insanity of the defendant under his plea of not guilty by reason of insanity at the time of the commission of the homicide, other than evidence of the immediate circumstances of the offense, would have been irrelevant and immaterial on the trial of the general issue as to the guilt or innocence of the defendant raised by the general plea of not guilty. As the statute accorded the defendant his full right, and ample opportunity to submit to a jury his plea of insanity at the time of the commission of the offense, in excuse of his act and as a reason why no penalty of the law should be visited upon him, it follows that the trial court correctly excluded the evidence on the trial of the general issue.

"Furthermore, the only evidence admissible for the purpose of enabling the jury to determine whether the death penalty or life imprisonment should be imposed in the event the defendant should be found guilty of murder in the first degree was the evidence which the court did admit, and which concerned 'the circumstances connected with the offense.' (*People* v. *Golsh,* 63 Cal. App. 609, 613 et seq. [219 Pac. 456]; see, also, *People* v. *Witt,* 170 Cal. 104, 110 [148 Pac. 928].) The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as the sane man, and if he is not responsible at all

he is entitled to an acquittal in both degrees. (*State* v. *Maioni,* 78 N. J. L. 239 [20 Ann. Cas. 204, 74 Atl. 526, 528].)'' An analogous argument was also advanced in *People* v. *Lazarus,* 207 Cal. 507 [279 Pac. 145], and its soundness denied.