[Sac. No. 7981. In Bank. Jan. 20, 1975.]

ROSEMARY E. SMITH, Plaintiff and Respondent, v.
JEROME R. LEWIS, Defendant and Appellant.

350

352

## COUNSEL

Bullen, McKone & McKinley, George W. Bullen, Robert A. Seligson and Stephen J. Gay for Defendant and Appellant.

Bonelli & Brown and R. Edward Brown as Amici Curiae on behalf of Defendant and Appellant.

Edward Freidberg for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant Jerome R. Lewis, an attorney, appeals from a judgment entered upon a jury verdict for plaintiff Rosemary E. Smith in an action for legal malpractice. The action arises as a result of legal services rendered by defendant to plaintiff in a prior divorce proceeding. The gist of plaintiff's complaint is that defendant negligently failed in the divorce action to assert her community interest in the retirement benefits of her husband.

Defendant principally contends, inter alia, that the law with regard to the characterization of retirement benefits was so unclear at the time he represented plaintiff as to insulate him from liability for failing to assert a claim therefor on behalf of his client.[1] We conclude defendant's appeal is without merit, and therefore affirm the judgment.

In 1943 plaintiff married General Clarence D. Smith. Between 1945 and his retirement in 1966 General Smith was employed by the

[1]Defendant alternatively contends the state and federal military retirement benefits in question cannot properly be characterized as community property, and hence his advice to plaintiff was correct. As will appear, the contention is manifestly untenable in light of recent decisions by this court. (*In re Marriage of Fithian* (1974) 10 Cal.3d 592 [111 Cal.Rptr. 369, 517 P.2d 449]; *Waite v. Waite* (1972) 6 Cal.3d 461 [99 Cal.Rptr. 325, 492 P.2d 13]; *Phillipson v. Board of Administration* (1970) 3 Cal.3d 32 [89 Cal.Rptr. 61, 473 P.2d 765].)

California National Guard. As plaintiff testified, she informed defendant her husband "was paid by the state . . . it was a job just like anyone else goes to." For the first 16 years of that period the husband belonged to the State Employees' Retirement System, a contributory plan.[2] Between 1961 and the date of his retirement he belonged to the California National Guard retirement program, a noncontributory plan. In addition, by attending National Guard reserve drills he qualified for separate retirement benefits from the federal government, also through a noncontributory plan. The state and federal retirement programs each provide lifetime monthly benefits which terminate upon the death of the retiree. The programs make no allowance for the retiree's widow.

On January 1, 1967, the State of California began to pay General Smith gross retirement benefits of $796.26 per month. Payments under the federal program, however, will not begin until 1983, i.e., 17 years after his actual retirement, when General Smith reaches the age of 60. All benefits which General Smith is entitled to receive were earned during the time he was married to plaintiff.

On February 17, 1967, plaintiff retained defendant to represent her in a divorce action against General Smith. According to plaintiff's testimony, defendant advised her that her husband's retirement benefits were not community property. Three days later defendant filed plaintiff's complaint for divorce. General Smith's retirement benefits were not pleaded as items of community property, and therefore were not considered in the litigation or apportioned by the trial court. The divorce was uncontested, and the interlocutory decree divided the minimal described community property and awarded Mrs. Smith $400 per month in alimony and child support. The final decree was entered on February 27, 1968.

On July 17, 1968, pursuant to a request by plaintiff, defendant filed on her behalf a motion to amend the decree, alleging under oath that because of his mistake, inadvertence, and excusable neglect (Code Civ. Proc., § 473) the retirement benefits of General Smith had been omitted from the list of community assets owned by the parties, and that such benefits were in fact community property. The motion was denied on the ground of untimeliness. Plaintiff consulted other counsel, and shortly

---

[2] A contributory plan is one in which the member contributes to his retirement fund, normally through payroll deductions. A noncontributory plan is one in which no such contributions are made.

The State Employees' Retirement System is now referred to as the Public Employees' Retirement System (Gov. Code, § 20000 et seq.).

thereafter filed this malpractice action against defendant.

Defendant admits in his testimony that he assumed General Smith's retirement benefits were separate property when he assessed plaintiff's community property rights. It is his position that as a matter of law an attorney is not liable for mistaken advice when well informed lawyers in the community entertain reasonable doubt as to the proper resolution of the particular legal question involved. Because, he asserts, the law defining the character of retirement benefits was uncertain at the time of his legal services to plaintiff, defendant contends the trial court committed error in refusing to grant his motions for nonsuit and judgment notwithstanding the verdict and in submitting the issue of negligence to the jury under appropriate instructions.[3]

■ The law is now settled in California that "retirement benefits which flow from the employment relationship, to the extent they have vested, are community property subject to equal division between the spouses in the event the marriage is dissolved." (*In re Marriage of Fithian* (1974) *supra,* 10 Cal.3d 592, 596, citing *Waite* v. *Waite* (1972) *supra,* 6 Cal.3d 461; *Phillipson* v. *Board of Administration* (1970) *supra,* 3 Cal.3d 32; *Benson* v. *City of Los Angeles* (1963) 60 Cal.2d 355 [33 Cal.Rptr. 257, 384 P.2d 649]; *French* v. *French* (1941) 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366]; *Crossan* v. *Crossan* (1939) 35 Cal.App.2d 39 [94 P.2d 609].) Because such benefits are part of the consideration earned by the employee, they are accorded community treatment regardless of whether they derive from a state, federal, or private source, or from a contributory or noncontributory plan. (10 Cal.3d at p. 596.) ■■■■ In light of these principles, it becomes apparent that General Smith's retirement pay must properly be characterized as community property.[4]

---

[3]The jury was instructed as follows: "In performing legal services for a client in a divorce action an attorney has the duty to have that degree of learning and skill ordinarily possessed by attorneys of good standing, practicing in the same or similar locality and under similar circumstances.

"It is his further duty to use the care and skill ordinarily exercised in like cases by reputable members of his profession practicing in the same or a similar locality under similar circumstances, and to use reasonable diligence and his best judgment in the exercise of his skill and the accomplishment of his learning, in an effort to accomplish the best possible result for his client.

"A failure to perform any such duty is negligence.

"An attorney is not liable for every mistake he may make in his practice; he is not, in the absence of an express agreement, an insurer of the soundness of his opinions."

[4]The fact General Smith will not receive any portion of the federal benefits until he reaches the age of 60 does not affect their community character. Though his right to the payments remained unmatured at the time of the divorce, it had fully vested. (*In re Marriage of Fithian* (1974) *supra,* 10 Cal.3d 592, 596, fn. 2; *Williamson* v. *Williamson* (1962) 203 Cal.App.2d 8, 11 [21 Cal.Rptr. 164].)

We cannot, however, evaluate the quality of defendant's professional services on the basis of the law as it appears today. ■ In determining whether defendant exhibited the requisite degree of competence in his handling of plaintiff's divorce action, the crucial inquiry is whether his advice was so legally deficient when it was given that he may be found to have failed to use "such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685].) We must, therefore, examine the indicia of the law which were readily available to defendant at the time he performed the legal services in question.

The major authoritative reference works which attorneys routinely consult for a brief and reliable exposition of the law relevant to a specific problem uniformly indicated in 1967 that vested retirement benefits earned during marriage were generally subject to community treatment.[5] (See, e.g., Note, Pensions, and Reserve or Retired Pay, as Community Property, 134 A.L.R. 368; 15 Am.Jur.2d, Community Property, § 46, p. 859; 38 Cal.Jur.2d, Pensions, § 12, p. 325; 10 Cal.Jur.2d, Community Property, § 25, p. 692; 1 Cal. Family Lawyer (Cont.Ed.Bar 1962) p. 111; 4 Witkin, Summary of Cal. Law (1960) pp. 2723-2724; cf. 41 C.J.S., Husband and Wife, § 475, p. 1010 & fn. 69, and 1967 Supp. p. 1011.) A typical statement appeared in The California Family Lawyer, a work with which defendant admitted general familiarity: "Of increasing importance is the fact that pension or retirement benefits . . . are community property, even though they are not paid or payable until after termination of the marriage by death or divorce." (1 Cal. Family Lawyer, *supra,* at p. 111.)

Although it is true this court had not foreclosed all conflicts on some aspects of the issue at that time, the community character of retirement benefits had been reported in a number of appellate opinions often cited in the literature and readily accessible to defendant. (*Benson* v. *City of Los Angeles* (1963) *supra,* 60 Cal.2d 355; *French* v. *French* (1941) *supra,* 17 Cal.2d 775; *Cheney* v. *City & County of San Francisco* (1936) 7 Cal.2d 565 [61 P.2d 754]; *Williamson* v. *Williamson* (1962) *supra,* 203 Cal.App.2d 8; *Estate of Manley* (1959) 169 Cal.App.2d 641 [337 P.2d 487]; *Estate of Perryman* (1955) 133 Cal.App.2d 1 [283 P.2d 298]; *Crossan* v. *Crossan* (1939) *supra,* 35 Cal.App.2d 39.) In *Benson,* decided four years

[5]In evaluating the competence of an attorney's services, we may justifiably consider his failure to consult familiar encyclopedias of the law. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 465 [34 Cal.Rptr. 863, 386 P.2d 487].)

before defendant was retained herein, we stated directly that "pension rights which are earned during the course of a marriage are the community property of the employee and his wife." (60 Cal.2d at p. 359.) In *French*, decided two decades earlier, we indicated that "retirement pay is community property because it is compensation for services rendered in the past." (17 Cal.2d at p. 778.) The other cases contain equally unequivocal dicta.

We are aware, moreover, of no significant authority existing in 1967 which proposed a result contrary to that suggested by the cases and the literature, or which purported to rebut the general statutory presumption, as it applies to retirement benefits, that all property acquired by either spouse during marriage belongs to the community. (Civ. Code, § 5110, as amended Jan. 1, 1970; formerly Civ. Code, § 164.)

On the other hand, substantial uncertainty may have existed in 1967 with regard to the community character of General Smith's *federal* pension. The above-discussed treatises reveal a debate which lingered among members of the legal community at that time concerning the point at which retirement benefits actually vest.[6] (See also Kent, *Pension Funds and Problems Under California Community Property Laws* (1950) 2 Stan.L.Rev. 447; Note, *Community Property: Division of Expectancies as Community Property at Time of Divorce* (1942) 30 Cal.L.Rev. 469.) Because the federal payments were contingent upon General Smith's survival to age 60, 17 years subsequent to the divorce, it could have been argued with some force that plaintiff and General Smith shared a mere expectancy interest in the future benefits. (See *French* v. *French* (1941) *supra,* 17 Cal.2d 775, 778; but see fn. 4, *ante.*) Alternatively, a reasonable contention could have been advanced in 1967 that federal retirement benefits were the personal entitlement of the employee spouse and were not subject to community division upon divorce in the absence of express congressional approval. In fact, such was the conclusion reached in 1973 by Judge B. Abbott Goldberg in his scholarly article *Is Armed Services Retired Pay Really Community Property?* (1973) 48 State Bar Journal 12. Although we rejected Judge Goldberg's analysis in *In re Marriage of Fithian* (1974) *supra,* 10 Cal.3d 592, 597, footnote 2, the issue was clearly an arguable one upon which reasonable lawyers could differ. (See *Sprague* v. *Morgan* (1960) 185 Cal.App.2d 519, 523 [8 Cal.Rptr. 347]; Annot., 45 A.L.R.2d 5, 15.)

---

[6]Indeed this debate may, to some extent, continue today. See, e.g., *In re Marriage of Wilson* (1974) 10 Cal.3d 851 [112 Cal.Rptr. 405, 519 P.2d 165].

Of course, the fact that in 1967 a reasonable argument could have been offered to support the characterization of General Smith's federal benefits as separate property does not indicate the trial court erred in submitting the issue of defendant's malpractice to the jury. The *state* benefits, the large majority of the payments at issue, were unquestionably community property according to all available authority and should have been claimed as such. As for the *federal* benefits, the record documents defendant's failure to conduct any reasonable research into their proper characterization under community property law.[7] Instead, he dogmatically asserted his theory, which he was unable to support with authority and later recanted, that all noncontributory military retirement benefits, whether state or federal, were immune from community treatment upon divorce. The jury could well have found defendant's refusal to educate himself to the applicable principles of law constituted negligence which prevented him from exercising informed discretion with regard to his client's rights.

■ As the jury was correctly instructed, an attorney does not ordinarily guarantee the soundness of his opinions and, accordingly, is not liable for every mistake he may make in his practice. He is expected, however, to possess knowledge of those plain and elementary principles of law which are commonly known by well informed attorneys, and to discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Lally* v. *Kuster* (1918) 177 Cal. 783, 786 [171 P. 961]; *Floro* v. *Lawton* (1960) 187 Cal.App.2d 657, 673 [10 Cal.Rptr. 98]; *Sprague* v. *Morgan* (1960) *supra,* 185 Cal.App.2d 519, 523; *Armstrong* v. *Adams* (1929) 102 Cal.App. 677, 684 [283 P. 871].) If the law on a particular subject is doubtful or debatable, an attorney will not be held responsible for failing to anticipate the manner in which the uncertainty will be resolved. (See,

---

[7]At trial defendant testified that prior to the division of property in the divorce action, he had assumed the retirement benefits were not subject to community treatment, despite the fact General Smith had already begun to receive payments from the state; that he did not at that time undertake any research on the point nor did he discuss the matter with plaintiff; that subsequent to the divorce plaintiff asked defendant to research the question whereupon defendant discovered the *French* case which contained dictum in support of plaintiff's position; that the *French* decision caused him to change his opinion and conclude "that the Supreme Court, when it was confronted with this [the language in *French*] may hold that it [vested military retirement pay] is community property." On the basis of *French* defendant filed his unsuccessful motion to amend the final decree of divorce to allow plaintiff an interest in the retirement benefits. Defendant admitted at trial, "I would have been very willing to assert it [a community interest] on her behalf had I known of the dictum in the *French* case at the time."

e.g., *Sprague* v. *Morgan* (1960) *supra.*) But even with respect to an unsettled area of the law, we believe an attorney assumes an obligation to his client to undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem. In the instant case, ample evidence was introduced to support a jury finding that defendant failed to perform such adequate research into the question of the community character of retirement benefits and thus was unable to exercise the informed judgment to which his client was entitled. (See fn. 7, *ante.*)

We recognize, of course, that an attorney engaging in litigation may have occasion to choose among various alternative strategies available to his client, one of which may be to refrain from pressing a debatable point because potential benefit may not equal detriment in terms of expenditure of time and resources or because of calculated tactics to the advantage of his client. But, as the Ninth Circuit put it somewhat brutally in *Pineda* v. *Craven* (9th Cir. 1970) 424 F.2d 369, 372: "There is nothing strategic or tactical about ignorance . . . ." In the case before us it is difficult to conceive of tactical advantage which could have been served by neglecting to advance a claim so clearly in plaintiff's best interest, nor does defendant suggest any. The decision to forego litigation on the issue of plaintiff's community property right to a share of General Smith's retirement benefits was apparently the product of a culpable misconception of the relevant principles of law, and the jury could have so found.

Furthermore, no lawyer would suggest the property characterization of General Smith's retirement benefits to be so esoteric an issue that defendant could not reasonably have been expected to be aware of it or its probable resolution. (*Lucas* v. *Hamm* (1961) *supra,* 56 Cal.2d 583.) In *Lucas* we held that the rule against perpetuities poses such complex and difficult problems for the draftsman that even careful and competent attorneys occasionally fall prey to its traps. The situation before us is not analogous. Certainly one of the central issues in any divorce proceeding is the extent and division of the community property. In this case the question reached monumental proportions, since General Smith's retirement benefits constituted the only significant asset available to the community.[8] In undertaking professional representation of plaintiff,

---

[8]It is undisputed that the only assets the parties had to show as community property after 24 years of marriage, aside from General Smith's retirement benefits, were an equity of $1,800 in a house, some furniture, shares of stock worth $2,800, and two automobiles on which money was owing.

defendant assumed the duty to familiarize himself with the law defining the character of retirement benefits; instead, he rendered erroneous advice contrary to the best interests of his client without the guidance through research of readily available authority.

Regardless of his failure to undertake adequate research, defendant through personal experience in the domestic relations field had been exposed to community property aspects of pensions. Representing the wife of a reserve officer in the National Guard in 1965, defendant alleged as one of the items of community property "the retirement benefits from the Armed Forces and/or the California National Guard." On behalf of the husband in a 1967 divorce action, defendant filed an answer admitting retirement benefits were community property, merely contesting the amount thereof. In 1965 a wife whom he was representing was so insistent on asserting a community interest in a pension, over defendant's contrary views, that she communicated with the state retirement system and brought to defendant correspondence from the state agency describing her interest in pension benefits. And representing an army colonel, defendant filed a cross-complaint for divorce specifically setting up as an item of community property "retirement benefits in the name of the defendant with the United States Government." It is difficult to understand why defendant deemed the community property claim to pensions of three of the foregoing clients to deserve presentation to the trial court, but not the similar claim of this plaintiff.

██ In any event, as indicated above, had defendant conducted minimal research into either hornbook or case law, he would have discovered with modest effort that General Smith's state retirement benefits were likely to be treated as community property and that his federal benefits at least arguably belonged to the community as well. Therefore, we hold that the trial court correctly denied the motions for nonsuit and judgment notwithstanding the verdict and properly submitted the question of defendant's negligence to the jury under the instructions given. (See fn. 3, *ante.*) For the same reasons, the trial court correctly refused to instruct the jury at defendant's request that "he is not liable for being in error as to a question of law on which reasonable doubt may be entertained by well informed lawyers." Even as to doubtful matters, an attorney is expected to perform sufficient research to enable him to make an informed and intelligent judgment on behalf of his client.[9]

---

[9]The principal thrust of the dissent is its conclusion (*post,* pp. 372-373) that "even assuming that defendant was negligent in failing to research the pension questions, the record does

Having concluded the issue of negligence was properly placed before the jury, we now consider defendant's claims that the verdict was excessive and unsupported by the evidence and that the trial court used an incorrect measure of damages in making a unitary award of $100,000. An economist appearing on plaintiff's behalf as an expert witness testified to the actuarial current value of the benefits payable under the state and federal retirement plans. His assessment was based upon General Smith's life expectancy of approximately 29 years, the total amount of future monthly payments from the pensions, including estimated cost of living increases, and an assumed average rate of interest. It was the witness' opinion that the state retirement benefits had a present value of $272,954 and the federal benefits were currently worth $49,078. Thus the estimated total value was $322,032, one-half of which is $161,016.

■ Defendant, on the other hand, presented no evidence on the issue of damages. His cross-examination of plaintiff's expert on questions such as General Smith's physical condition relative to his life expectancy and whether taxes were improperly omitted from his computation bears on the weight to be accorded the witness' conclusions, but does not prevent the testimony from supporting the verdict. Valuation is a question of fact for the jury, and its award of $100,000 in this case was well within the range of damages suggested by substantial evidence. (See *Nestle* v. *City of Santa Monica* (1972) *supra,* 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]; *Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231].)

Few cases have considered what constitutes the proper measure of damages in a legal malpractice action. The general rule is that a plaintiff is entitled only to be made whole: i.e., when the attorney's negligence lies in his failure to press a meritorious claim, the measure of damages is the value of the claim lost. (*Lally* v. *Kuster* (1918) *supra,* 177 Cal. 783,

---

not furnish a balance of probabilities that his negligence—rather than the uncertain status of the law and the availability of uncontested alimony—caused plaintiff to lose a $100,000 pension award." Whether defendant's negligence was a cause in fact of plaintiff's damage—an element of proximate cause—is a factual question for the jury to resolve. (*Valdez* v. *Clark* (1959) 173 Cal.App.2d 476, 478-479 [343 P.2d 281]; *Land* v. *Gregory* (1959) 168 Cal.App.2d 15, 19 [335 P.2d 141]; *Hill* v. *Matthews Paint Co.* (1957) 149 Cal.App.2d 714, 723 [308 P.2d 865]; Rest.2d Trusts, § 434.) Here the jury was correctly instructed that plaintiff had the burden of proving, inter alia, that defendant's negligence was a proximate cause of the damage suffered, and proximate cause was defined as "a cause which, in natural and continuous sequence, produces the damage, and *without which the damage would not have occurred.*" (Italics added.) Under the strict standards governing appellate review of disputed questions of fact (see, e.g., *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]; *Land* v. *Gregory* (1959) *supra,* 168 Cal.App.2d 15, 18-19), we see no reason on the present record to disturb the jury's implied finding of proximate cause.

791.) ■ Or, as stated by Justice Peters in *Pete* v. *Henderson* (1954) 124 Cal.App.2d 487, 489 [269 P.2d 78], an attorney's "liability, as in other negligence cases, is for all damages directly and proximately caused by his negligence." Here, it is contended, the court's award of a gross sum permitted plaintiff to receive a windfall in excess of the loss occasioned by defendant's negligence.

It is true that if defendant had claimed General Smith's retirement benefits as community property in the original proceedings, as the jury found he should have done, the divorce court could not have awarded plaintiff her interest therein by a total sum calculated at present value. In *Phillipson* v. *Board of Administration* (1970) *supra,* 3 Cal.3d 32, 46, we indicated that *"if the community musters sufficient assets to do so,* the preferable mode of division would be to award the pension rights to the employee and property of equal value to the spouse." (Italics added; accord, *Waite* v. *Waite* (1972) *supra,* 6 Cal.3d 461, 473-474.) But such disposition presupposes the existence of other community assets equivalent in worth to the discounted value of the nonemployee spouse's interest in the retirement benefits. In the case at bar, the community possessed no such assets. (See fn. 8, *ante.*) The divorce court, therefore, would have been compelled to order General Smith to pay plaintiff her share of his retirement benefits on a monthly basis as he receives them. (See, e.g., *In re Marriage of Fithian* (1974) *supra,* 10 Cal.3d 592; *Waite* v. *Waite, supra; In re Marriage of Karlin* (1972) 24 Cal.App.3d 25 [101 Cal.Rptr. 240]; *Bensing* v. *Bensing* (1972) 25 Cal.App.3d 889 [102 Cal.Rptr. 255].)

A court of law, however, has no power to duplicate the variety of remedies available to a divorce court sitting in equity. ■ In an action at law for malpractice, as in any negligence suit, the court is limited in its remedy to one award of money damages because it lacks the equitable power of contempt to enforce its judgment. Accordingly, the sum in this case was necessarily derived from an actuarial projection of the accumulated damage suffered by plaintiff now and in the future. By this method, the trial court was best able to approximate within its acknowledged powers the value of the claim lost to plaintiff through defendant's negligence.[10]

---

[10]As with all actuarial projections, it is likely that General Smith will not live the precise number of years estimated in the calculation. However, the possibility he will live less than that number is no greater than the possibility he will live more. Thus, as is true of all tort awards computed on a lump-sum basis, the chances of windfall are equally distributed.

Defendant next contends that inadmissible character evidence was introduced against him in violation of Evidence Code section 1104.[11] ■ At trial plaintiff called a witness who had been represented previously by defendant in an unrelated divorce action. Her husband had belonged to the State Employees' Retirement System. The witness testified that she gave defendant certain documents furnished by the State of California to aid her in claiming her share of her husband's retirement benefits. Among other matters, the transmittal letter from the state described her community interest in the benefits and outlined procedures to preserve her rights. She further testified that defendant advised her that the retirement fund and its benefits were not community property despite their contributory nature. Although she disagreed and argued, defendant insisted upon his position in order to obtain the divorce without a lengthy or difficult trial. The witness stated that she finally acquiesced in the settlement.

Defendant conceded at trial that the testimony regarding his receipt of the documents was admissible on the issue of his awareness of the State of California's view of retirement benefits as community property. He objected to the balance, however, on the ground that evidence of prior conduct cannot be used to demonstrate subsequent negligence.

In response to plaintiff's questioning at trial, defendant testified that a contributory retirement fund and its benefits are properly classed as community property. He also stated that as an attorney he always attempted to achieve the best possible result for his client, no matter how tenuous he viewed a useful theory, and that if he personally entertained any doubt that an asset belonged to the community he would seek to assert his client's interest therein. Such testimony may legitimately be impeached by showing that defendant had made contradictory statements in the past and had conducted himself in an inconsistent manner, though the impeachment may relate to a collateral matter. (Evid. Code, §§ 776, 780; Law Revision Com. comment to Evid. Code, § 780; *Laird* v. *T. W. Mather, Inc.* (1958) 51 Cal.2d 210, 219 [331 P.2d 617]; *People* v. *Pierce* (1969) 269 Cal.App.2d 193, 199 [75 Cal.Rptr. 257]; *Daggett* v. *Atchison T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 662 [313 P.2d 557]; *Estate of Lances* (1932) 216 Cal. 397, 404 [14 P.2d 768]; Witkin, Cal. Evidence (2d ed. 1966) § 1187, pp. 1098-1099, § 1259, p. 1163.) Because the testimony in question was therefore admissible for the purpose of

---

[11]Evidence Code section 1104 states: "Except as provided in Sections 1102 and 1103, evidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion."

impeachment, we need not reach the issue whether the testimony was also admissible to prove facts other than subsequent conduct under Evidence Code section 1101, subdivision (b).[12]

■ Defendant also challenges the admission into evidence of a declaration which he filed in support of plaintiff's motion under section 473 of the Code of Civil Procedure[13] to amend the final divorce decree to include General Smith's retirement benefits as divisible community property. The declaration stated in essence that the benefits were in fact community property, but were not so pleaded because of defendant's mistake, inadvertence, and excusable neglect. The trial court allowed the declaration into evidence over objection as an admission of a party opponent. (Evid. Code, § 1220.)

While defendant's declaration was not rendered inadmissible by virtue of the hearsay rule, it properly should have been excluded from evidence on the ground that it had insubstantial probative value. (Evid. Code, § 352.) Although the trial judge is traditionally accorded wide discretion in these matters (*Adkins* v. *Brett* (1920) 184 Cal. 252, 258 [193 P. 251]), the evidence here has dubious relevance to the issues in the lawsuit. Not only is the declaration conclusionary in form and nondescriptive of defendant's actual conduct, but it was filed on behalf of plaintiff at her request and represents merely an effort by defendant to advance his client's cause. In contrast to its probative value, the harmful effect of the declaration in the eyes of the jury was potentially significant. On its face the declaration, under oath, is manifestly a confession of error on the part of defendant. The jury possibly could have misunderstood its context or its purpose, or confused the quantum of asserted negligence necessary to permit the amendment of a judgment with that required to support a finding of malpractice.

Furthermore, as is the case with offers of compromise and subsequent remedial conduct, extrinsic policy reasons exist for excluding the declaration from evidence. (See Evid. Code, § 1150 et seq.) Were we to

---

[12]Evidence Code section 1101, subdivision (b), states: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

[13]Code of Civil Procedure section 473 provides in pertinent part: "The court may, upon such terms as may be just, relieve a party or his legal representative from a judgment, order, or other proceeding taken against him through his mistake, inadvertence, surprise or excusable neglect."

sanction the admissibility of such evidence, tension might develop between an attorney's duty to zealously represent his client (A.B.A. Code of Prof. Responsibility, Canon 7) and his instinct of self-protection. As a result, the attorney could become reluctant to seek an amended judgment under Code of Civil Procedure section 473, and the quality of legal representation in the state might suffer accordingly. In short, an attorney should be able to admit a mistake without subjecting himself to a malpractice suit.[14] Therefore, we conclude, the trial court erred in admitting the declaration into evidence.

Nevertheless, after review of the record in its entirety, it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. The section 473 declaration played a minor role in a lengthy and complex trial. Considerable independent evidence was presented upon which the jury could have based its finding of negligence, and at most the declaration had a cumulative effect. Furthermore, defendant's statements were merely read to the jury and not placed before it in evidence as an exhibit. He had ample opportunity at that time to rebut their effect and to explain the circumstances under which the declaration was filed. Thus, the admission of the declaration into evidence, though error, was not sufficiently prejudicial to warrant our reversing the judgment. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant's remaining contentions of error are without merit and require no further discussion.

The judgment is affirmed.

Wright, C. J., Tobriner, J., Sullivan, J., and Burke, J.*, concurred.

**CLARK, J.**—I dissent.

The evidence is insufficient to prove plaintiff lost $100,000 from her lawyer's negligence in 1967. There is no direct evidence a well informed lawyer would have obtained an award of the husband's pensions in the wife's divorce, nor does the record provide such inference. Rather, the

[14]The court properly so instructed the jury. (See final paragraph of fn. 3, *ante.*)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

state of the law and the circumstances of the parties reveal lawyer Lewis reached a reasonable result for his client in 1967.

To establish liability for negligence, a plaintiff must show defendant's negligence contributed to injury so that "but for" the negligence the injury would not have been sustained. If the injury would have occurred anyway—whether or not the defendant was negligent—the negligence was not a cause in fact. (4 Witkin, Summary of Cal. Law (8th ed. 1970) § 622, pp. 2903-2904; Rest.2d Torts (1966) § 432; Prosser, The Law of Torts (4th ed. 1971) p. 236 et seq.) "It is not enough merely to show that the probabilities were evenly divided. The evidence must be such that it could be found the balance of probabilities was in plaintiff's favor. (Prosser, '*Proximate Cause in California,*' 38 Cal.L.Rev. 369, 378-379.)" (*Singh* v. *Frye* (1960) 177 Cal.App.2d 590, 593 [2 Cal.Rptr. 372].)

This fundamental principle is reflected in legal malpractice cases. Prior to today's majority opinion, a lawyer was "not liable for being in error as to a question of law on which reasonable doubt may be entertained by well-informed lawyers. [Citations.]" (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685].) The rule has been variously stated: " 'It has frequently been held that a lawyer is not liable for lack of knowledge as to the true state of the law where a doubtful or debatable point is involved.' " (*Sprague* v. *Morgan* (1960) 185 Cal.App.2d 519, 523 [8 Cal.Rptr. 347].) Or, a lawyer " 'is not holden for errors in judgment nor in cases where well-informed attorneys entertain different views concerning a proposition of law which has not been settled.' " (*Floro* v. *Lawton* (1960) 187 Cal.App.2d 657, 673 [10 Cal.Rptr. 98], quoting from 69 N.J.L.J. 265.) It should be noted the foregoing statements go beyond lawyer *negligence,* going to the ultimate question of *liability*—he shall not be "liable" or "holden" for the errors.

The advice or services performed by the lawyer may be rendered erroneous by subsequent decisions, but if his contemporaries could reasonably have been expected to have performed in the same manner, it is illogical to assume the client would have gained more by having chosen another lawyer. The point is illustrated by the reasoning in *Lucas* v. *Hamm, supra,* 56 Cal.2d 583, 593, involving a lawyer who prepared a will violating the rule against perpetuities. The court compared his position with that of a nonnegligent lawyer, stating there was no liability because "an attorney of ordinary skill acting under the same circumstances might well have 'fallen into the net which the Rule spreads for the unwary' and failed to recognize the danger."

When we consider the law existing in 1967 and the circumstances of the parties, it cannot be concluded on the record before us that it was probable another lawyer would have obtained pension rights for plaintiff in addition to the award obtained for her by defendant.

As the majority opinion points out, when defendant was employed to procure the divorce in 1967, the law was clear that, other than military retirement payments, pension *payments* constituted community property. (E.g., *Benson* v. *City of Los Angeles* (1963) 60 Cal.2d 355, 359 [33 Cal.Rptr. 257, 384 P.2d 649]; 4 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 2733-2734.) However, *no reported California case prior to 1967 stated that a court was empowered to award an employee's future pension benefits to his spouse in a divorce action.* To the contrary, there were strong indications from statutory and case authorities that such an award could not be obtained. Further, in every reported case where a spouse sought award of the employee's pension, that spouse lost.[1]

Let us examine the hurdles faced by a 1967 lawyer seeking the pensions now claimed by plaintiff.[2]

### INTEREST IS MERE EXPECTANCY

The first hurdle for a spouse seeking to recover an employee's pension in 1967 was the doctrine enunciated in *Williamson* v. *Williamson* (1962) 203 Cal.App.2d 8, 11 [21 Cal.Rptr. 164], that in a divorce action pensions could be taken into account only to the extent that the employee had received benefits or was certain to receive benefits. The court stated: "The principle established by these cases [*French* v. *French* (1941) 17 Cal.2d 775 (112 P.2d 235, 134 A.L.R. 366); *Cheney* v. *City & County of*

---

[1]*Crossan* v. *Crossan* (1939) 35 Cal.App.2d 39 [94 P.2d 609], did not involve an award of the employee's pension payments or benefits. In *Crossan* the employee's contributions to the pension fund were subject to withdrawal if his employment was terminated. The court held the divorce court could take into account the employee's interest in the fund and award his spouse more than one-half of the remaining community property to compensate for the contributions. There is no language in *Crossan* suggesting that an employee's pension *benefits* could be awarded to the spouse.

*Crossan* is not helpful to plaintiff because the husband's contributions for retirement had been refunded several years prior to the divorce. Moreover, even if the contributions had not been previously withdrawn, *Crossan* would not have aided her significantly in an attempt to recover additional property because plaintiff received substantially all of the community property other than the pensions.

[2]In doing so, we must assume that any claim by plaintiff would have been opposed by competent counsel. To assume otherwise in a malpractice action would place a burden on the lawyer to have made claims of such doubtful merit that the only hope of success would have been lack of opposition. Certainly, we should not encourage lawyers to make such claims, much less impose a duty to engage in the questionable practice.

*San Francisco* (1936) 7 Cal.2d 565 (61 P.2d 754); *Crossan* v. *Crossan, supra,* 35 Cal.App.2d 39] is that pensions become community property, subject to division in a divorce, when and *to the extent* that the party is *certain* to receive some payment or recovery of funds. To the extent that payment is, at the time of the divorce, subject to conditions which may or may not occur, the pension is an *expectancy,* not subject to division as community property." (Italics added.) In earlier discussion, the court quoted language in *Cheney* v. *City & County of San Francisco, supra,* 7 Cal.2d 565, referring to the contingent event of death. (203 Cal.App.2d at p. 10.) Reading the two statements together, it appears the divorce court could not award future pension payments if they were conditioned on the employee's survival. In the instant case, such a rule would mean the divorce court could have awarded only an amount equal to the first two state pension payments received before the divorce decree.[3] Future payments were apparently subject to the contingency of survival. The first two payments were approximately $1,300, far less than the $100,000 award.

## Vested Rights and Employer's Interests

The next hurdle facing counsel seeking a share of pension benefits in 1967 was authority indicating a spouse could not have a vested right in an employee's pension because it would interfere with the employer's interests in two respects. In *Benson* v. *City of Los Angeles, supra,* 60 Cal.2d 355, 361-362, it was stated that the public policy permitting a governmental body to make reasonable modifications and changes to a retirement system "would be defeated by the vesting of rights in someone other than the employee." The court also stated: "No reason is suggested why we should depart from the foregoing decisions to the effect that a wife of a public employee acquires no vested interest in a pension until it becomes payable to her. On the other hand, to vest such an interest prior thereto 'would remove a considerable amount of the flexibility necessary for operation of pension systems, because it would mean that provisions benefiting any third person would be frozen into the law with respect to all employees then in service and that these interests could not be removed regardless of the consent of the employee and regardless of whether the employee was given other pension benefits which might be of greater value to him than the one sought to be eliminated.' (*Packer* v. *Board of Retirement, supra,* 35 Cal.2d 212, 217 [217 P.2d 660].)"

---

[3]The statements relied upon by the majority (*ante,* pp. 356-357) from *Benson* v. *City of Los Angeles, supra,* 60 Cal.2d 355, 359 and *French* v. *French, supra,* 17 Cal.2d 775, 778, are consistent with the suggested interpretation of *Williamson.* I assume that the funds had not been spent.

The second reason in *Benson* for denying the spouse a vested right was that it would defeat the employer's purpose in providing a pension, namely, inducing competent persons to enter and remain in public service. (60 Cal.2d at p. 361.)

In *Benson* the court concluded: "The vested interest which the wife may protect by her collateral control thus precludes an involuntary deprivation thereof in the case of the community interest in *insurance* on the husband's life. But the acquisition by a wife of a vested interest in her husband's public employment contract might defeat the public purpose in providing a retirement plan for public employees. The distinction lies in the nature of the control which the law permits the husband and wife to independently, lawfully exercise regardless of the community nature of the pension right, *and for policy reasons it is deemed necessary that the husband-employee alone exercise control unhampered by vested interests in any third party, including his community partner.*" (Italics added; 60 Cal.2d at p. 363.)

### EXEMPTION STATUTES

In 1967 there were numerous statutes exempting pensions from court process and prohibiting their assignment. A partial listing including nine such statutes is contained in *Ogle* v. *Heim* (1968) 69 Cal.2d 7, 9, footnote 1 [69 Cal.Rptr. 579, 442 P.2d 659]. In *Ogle,* and the companion case of *Miller* v. *Superior Court* (1968) 69 Cal.2d 14, 16 [69 Cal.Rptr. 583, 442 P.2d 663], this court unanimously held that the exemption statutes were applicable to claims for child support and alimony, and refused to create a family obligation exception. (See also, *Thomas* v. *Thomas* (1961) 192 Cal.App.2d 771, 780-785 [13 Cal.Rptr. 872].) When in 1970 it was held that the exemption statutes would not preclude the divorce court awarding employee pension rights to a spouse, this court—although discussing the question for four pages—was unable to cite any California authority in favor of its position. (*Phillipson* v. *Board of Administration,* 3 Cal.3d 32, 43-47 [89 Cal.Rptr. 61, 473 P.2d 765].) It must be concluded that in 1967 the existing statutory and case law indicated that exemption statutes would preclude divorce court award of pension payments.

### ALIMONY ADJUSTMENTS IN LIEU OF PENSION AWARDS

Two cases suggested that alimony award and modification, rather than a community property division, was the appropriate method to remedy imbalances arising from the husband's receipt of pension benefits.

(*Kinsey* v. *Kinsey* (1964) 231 Cal.App.2d 219, 222 [41 Cal.Rptr. 802]; *Williamson* v. *Williamson, supra,* 203 Cal.App.2d 8, 12.) Further, because both cases had refused to award any part of an employee's pension to his spouse, the implication existed that award and modification of alimony was the *sole method* available to the divorce court.

## FEDERAL LAW

The majority concedes that in 1967 there was substantial doubt whether federal military pensions constituted community property, awardable in a divorce action.

Aside from the questions discussed above, the principal argument that military pensions were not community property was based on the cases relating to National Service Life Insurance benefits. *Wissner* v. *Wissner* (1949) 89 Cal.App.2d 759, 764-771 [201 P.2d 837], had held that where the premiums were paid by community funds, the insurance proceeds became community property, and the widow would be entitled to half the benefits. (Petition for hearing denied with Schauer, J., voting for a hearing.) The United States Supreme Court reversed, holding that because federal statute specified the insured could designate and change the beneficiary, an award of a share of the policy proceeds to the widow, when another was designated as beneficiary, would frustrate the intention of Congress. (*Wissner* v. *Wissner* (1950) 338 U.S. 655, 658 et seq. [94 L.Ed. 424, 428, 70 S.Ct. 398]; see *Estate of Allie* (1958) 50 Cal.2d 794, 798 et seq. [329 P.2d 903].)

The principle enunciated by the United States Supreme Court in *Wissner* of giving effect to the statutory provision governing the benefit at the expense of the community property system was applied under California law in *Benson* v. *City of Los Angeles, supra,* 60 Cal.2d 355. This court held that the *widow's* benefit under a Los Angeles Charter provision, concededly community property of a first marriage, was payable in its entirety to the widowed second wife to the exclusion of the first wife.

In the light of *Wissner* and *Benson,* there existed strong reason to believe statutory provisions for payment to the retiree would be interpreted literally to effectuate congressional and legislative intent, thereby excluding community property claims. Additional legal problems inherent in an award of a military pension to a spouse, typical of those faced by counsel in 1967, are discussed in *In re Marriage of Fithian* (1974) 10 Cal.3d 592, 597-604 [111 Cal.Rptr. 369, 517 P.2d 449].

Although conceding this troubling federal question applied to the federal pension, the majority *incorrectly* implies the *Wissner* rule could not apply to the state pension. The majority opinion fails to recognize that the husband retired under section 228 of the Military and Veterans Code which is in accordance with "federal law, statutes, rules and regulations which . . . govern the retirement of commissioned officers and warrant officers of the reserve components of the Army of the United States on extended active duty; . . ." (Mil. & Vet. Code, § 228, see also §§ 100-104.) Certainly well informed counsel in 1967 could reasonably have concluded that by appropriating federal law, the Legislature intended it determinative of the character of the pensions.

## VICTORY?

Assuming defendant fully researched the question whether the pensions could be obtained and further assuming his analysis of the authorities led him to forecast this court's decisions in *Phillipson* v. *Board of Administration, supra*, 3 Cal.3d 32, *Waite* v. *Waite* (1972) 6 Cal.3d 461 [99 Cal.Rptr. 325, 492 P.2d 13], and *In re Marriage of Fithian, supra*, 10 Cal.3d 592, it does not follow that he should have pursued an award of the pensions. Although defendant by litigating the awardability of pensions would perhaps have performed a valuable service to the State of California by attempting to settle the law, the lawyer's first duty is to his client's best interest—not to the resolution of uncertain legal questions.

Considering the circumstances of this case, including the alimony obtained, expensive litigation by counsel to recover pensions would have gained the client little—if anything—above that obtained in the uncontested action. And, in view of the uncertainty in the law and the risk that the litigation might result in a net loss, pursuit of the pensions would have been an unrealistic alternative. After his retirement, the husband worked as an automobile salesman receiving commissions of approximately $300 per month. Plaintiff had been earning the same amount shortly before. Plaintiff informed defendant that her husband received $645 monthly pension from the National Guard. Under the divorce decree, plaintiff obtained substantially all of the community property for herself and her son, and was awarded $300 per month alimony and $100 per month child support for her son who was then 18. It is apparent that plaintiff would receive more than one-half of the expected joint incomes of the spouses from the pension payment and salaries.

Setting aside alimony awards because of error in the division of community property, this court has recognized the direct relationship between the two awards. (*See* v. *See* (1966) 64 Cal.2d 778, 786 [51 Cal.Rptr. 888, 415 P.2d 776]; *French* v. *French, supra,* 17 Cal.2d 775, 778; cf. *In re Marriage of Wilson* (1974) 10 Cal.3d 851, 856 [112 Cal.Rptr. 405, 519 P.2d 165].) The relationship is emphasized in *Kinsey* v. *Kinsey, supra,* 231 Cal.App.2d 219, 222, in the pension context: "Manifestly, it would be grossly inequitable to permit plaintiff to retain the benefits of the property settlement and the alimony payments as provided by the terms of the interlocutory judgment entered after the default hearing that resulted from the stipulation of the parties, and also now to permit her to 'modify' this agreement in such fashion as to entitle her as a matter of right to one-half of defendant's future income in the event of his retirement. Plaintiff's present alimony award is subject to future modification and is ample protection for her future right to share in any income her husband may receive by reason of his pension payments."

Because of the relationship between community property and alimony awards, it was to be anticipated that had defendant succeeded through litigation in establishing a right to assignment of the pensions, the alimony award would have been *greatly reduced* or *eliminated altogether* and the award of the remaining community property possibly altered. Although an award of part of the pension would no doubt have been more valuable than an alimony award of equal amount, the benefit pales in significance when viewed in light of the uncertainty of the law and the large expense required to establish the right to assignment. Further, litigation would have created the risk that a court might conclude not only that pensions did not constitute awardable community property but also, based on the relative earning abilities of the spouses, alimony should be less than $300.

## CONCLUSION

Given the uncertain status of the law, the circumstances of the parties, and the close relationship between property division and alimony payment, an ethical, diligent and careful lawyer would have avoided litigation over pension rights and instead would have sought a compensating alimony award for any inequity, as expressly suggested by *Kinsey* v. *Kinsey, supra,* 231 Cal.App.2d 219, 222, and *Williamson* v. *Williamson, supra,* 203 Cal.App.2d 8, 12.[4] So far as appears, defendant secured such compensating award.

---

[4]The possibility of effectively dealing with the pension in this manner was apparently unavailable to counsel in *Phillipson* v. *Board of Administration, supra,* 3 Cal.3d 32, the

Accordingly, even assuming that defendant was negligent in failing to research the pension questions, the record does not furnish a balance of probabilities that his negligence—rather than the uncertain status of the law and the availability of uncontested alimony—caused plaintiff to lose a $100,000 pension award.

I would adhere to the rule of *Lucas* v. *Hamm, supra,* 56 Cal.2d 583, 591, that an attorney is not liable for errors on issues "on which reasonable doubt may be entertained by well-informed lawyers." As shown above, such an issue was presented Attorney Lewis in 1967 concerning recovery of unpaid pension benefits in a divorce action. Further, the law applicable to federal pension benefits also presented such an issue, applicable not only to the federal pension but also to the state pension by section 228 of the Military and Veterans Code.[5]

The majority limits *Lucas* to "esoteric" cases. (*Ante,* p. 359.) Even assuming *Lucas* to be so limited, the hurdles discussed above certainly make the instant case as "esoteric" as *Lucas.* As pointed out by Professor Leach in his classic 1938 article, *Perpetuities in a Nutshell,* 51 Harvard Law Review 638, 669-670, violation of the rule against perpetuities—the claimed malpractice in *Lucas*—may be avoided by use of a simple standard clause placed in every will. The 22 pages of legal discussion since 1967 by this court establishing awardability of pensions generally, of statutory pensions, and of military pensions (*Phillipson* v. *Board of Administration, supra,* 3 Cal.3d 32, 39-50; *Waite* v. *Waite, supra,* 6 Cal.3d 461, 469-472; *In re Marriage of Fithian, supra,* 10 Cal.3d 592, 596-604) attest to the complexity of the pension issues.

I would reverse the judgment.

McComb, J., concurred.

---

first case to recognize assignability of pensions. There the employee had fled the jurisdiction apparently taking all of the community property funds other than his contributions to the pension fund. (3 Cal.3d at p. 38, fn. 2.)

[5]Careful counsel confronted with a pension question would customarily start their research with the statutory basis, if any, of the pension. Certainly all careful counsel would eventually look for the statutory basis. It is regrettable that, in a case upholding an attorney malpractice judgment on a theory of failure to research, the majority fails to even mention the statute establishing one of the pensions and containing provisions contrary to part of the majority's analysis.