607 N.W.2d 78 (2000)
Darl S. WILLIAMS, Plaintiff-Appellant,
v.
AMERISURE INSURANCE COMPANY, Defendant-Appellee.
Darl S. Williams, Plaintiff-Appellant,
v.
Organic Chemicals, Inc., Principal Defendant-Appellee, and
Amerisure Insurance Company, Garnishee Defendant-Appellee.
Docket Nos. 114169-114171, COA Nos. 171299, 176861, 177052.
Supreme Court of Michigan.
March 13, 2000.
On order of the Court, the application for leave to appeal from the February 5, 1999, decision of the Court of Appeals is considered, and it is DENIED because we are not persuaded that the question presented should be reviewed by this Court.
MARILYN J. KELLY, J., dissents and states as follows:
The Court of Appeals decision should be reversed. It upset a large jury verdict for the plaintiff, holding that he failed to prove that his employer committed an intentional tort under our test in Travis v. Dreis & Krump Mfg. Co., 453 Mich. 149, 551 N.W.2d 132 (1996). Plaintiff alleges that the Court of Appeals erroneously viewed the facts in a light most favorable to the defendant. I agree.
We held in Travis, supra, that a plaintiff must prove that his employer had actual knowledge that the injury that occurred was certain to occur. The employer must have wilfully disregarded that knowledge.
In this case, it was undisputed that plaintiff's manager knew that plaintiff had a liver condition that required he not be exposed to toxic chemicals. Plaintiff presented evidence showing that the chemical reactor he operated had an exhaust stack that was too short and lacked a carbon filter. The building's walls were porous sheet metal. Winds, particularly westerly winds, would force toxic vapors emitted from the stack back into the building through the walls.
Plaintiff's plant manager, Gene Gray, testified:

Q. Let's stay right there, Mr. Gray, for the time being. Let me ask you if the purpose of the carbon is to absorb vapors to prevent the vapors from entering the atmosphere?

A. Correct.

Q. Is that true?

A. Yes.

Q. And [subsequent to plaintiff's exposure] you did extend the stack and you added carbon filters to prevent operator injury; is that true?

A. Yes, that's true.

Q. You knew that 1,1,1-trichloroeth[ylene] was a chlorinated solvents, didn't you ...

A. Yes.

Q.... at the time Stan was hurt? And you knew that it'd be coming out of the stack, this ten-foot stack or 12-foot stack, didn't you?

A. Yes.

Q. You knew that Stan shouldn't be exposed to that chlorinated solvent, 1,1,1-trichloroeth[ylene], didn't you?

A. Yes.

Q. Did you tell Stan to work on that system?

A. Yes. I had instructed Stan to work on that system.
Further testimony showed that, before plaintiff was injured, defendant had notice that toxic fumes were emitted from the reactor and entered plaintiff's work area.
*79 Two days before plaintiff was exposed, another operator "charged" the reactor, resulting in the building filling with toxic fumes. The operator, Mr. Postma, testified that he told Mr. Gray about the event. He also testified that the infiltration of fumes into the building would not have occurred had the reactor been connected to a scrubber. He testified as follows:

Q. All right. Did you tell Gene Gray about [the fumes]?

A. Yes, I did.

Q. Did you tell him before Mr. Williams began to do work on the reactor the next day?

A. Sure. I called him that night and explained to him that I'd shut it off because it was too nasty.

Q. Pardon me?

A. It was too nasty in the building, and so I stopped charging it.

Q. Okay. Was this system, the R-201, hooked to the scrubber?

A. No, it was not.

Q. What is the scrubber?

A. It's a fume scrubber for what we use for just that purpose, to scrub the fumes before they get to the atmosphere.

Q. Do you think that it should have been hooked to the scrubber?

A. It would have been nice.

Q. Why is that?

A. We wouldn't have had that problem that I had at that time.

Q. All right. The building wouldn't have filled with fumes ...

A. No.

Q. ... is that right?

A. It would have been vented through that system.
Plaintiff's theory was that the reactor was not properly vented, because it was not connected to a scrubber. Mr. Postma testified that, if fumes were vented to the outside of the building, they would always blow back inside if there were a "westerly or northwest wind." He said that the plant manager, Gene Gray, knew of this condition. Furthermore, Gene Gray testified that he had directed the installation of the reactor. Hence, there was evidence that defendant knew that toxic fumes emitted from the stack would be blown by a westerly wind into the building and injure plaintiff.[1]
The Court of Appeals concluded that the defendant was shielded from liability because "[t]here was no evidence that [it] knew that the wind was blowing from the west while plaintiff was operating the reactor...." The Court of Appeals held, and Justice Corrigan believes, that to establish liability plaintiff had to prove that the employer knew where the wind blew from on the date in question. I believe that burden is inappropriate. It sufficed that defendant knew that plaintiff was certain to be exposed to and injured by the fumes as soon as the wind blew from the west or northwest.
The facts in this case are similar to those in Golec v. Metal Exchange Corp., the companion case to Travis, supra. In Golec, the plaintiff was severely injured while loading scrap into a furnace. The furnace exploded showering him with molten aluminum. He alleged that either water or aerosol cans caused the explosion. The defendant argued that he had been instructed regarding a method of loading wet scrap to avoid an explosion. The defendant also argued that, if an explosion were certain to occur, it would have happened earlier in the plaintiff's shift.
*80 We acknowledged in Golec that the plaintiff did not contend that "every load of scrap had the potential to explode because each load could have contained a closed aerosol can or water." Instead, we held that "[i]f the facts as alleged by plaintiff are established at trial, then plaintiff has proved the existence of a continually operative dangerous condition." Travis, supra at 186, 551 N.W.2d 132. In the case at bar, fumes may not have entered the building when the wind came from the east, north, or south. But, it was common knowledge that the wind often came from the west or northwest. Given that fact, the defendant's operation of an unfiltered reactor in the building where plaintiff worked constituted a "continually operative dangerous condition" as to this plaintiff.[2]
The circumstances in this case are also similar to those in the Film Recovery case that is discussed in both Travis, supra, and Beauchamp v. Dow Chemical Co., 427 Mich. 1, 398 N.W.2d 882 (1986). In Travis, we reiterated the facts of Film Recovery:
"Film Recovery Systems went into the business of recovering silver from film negatives. This was done by placing the negatives into vats of cyanide. Hydrogen cyanide gas would bubble up from the vats and there was inadequate ventilation. The employer knew about the dangers. The labels on the chemicals being used contained adequate warnings; as a result, the employer hired only employees who could not speak or read English. The workers complained about the fumes daily. In 1981, an inspector had warned that the operation had outgrown the plant. The employer's response was to move the executive offices while tripling the size of the operations. Eventually one worker died and several others were seriously injured because of hydrogen cyanide poisoning. The corporate officers were convicted of involuntary manslaughter." [Travis, supra at 177-178, n. 12, 551 N.W.2d 132, quoting Beauchamp, 427 Mich. at 23-24, 398 N.W.2d 882.]
We agreed with Professor Larson who opined in his treatise on worker's compensation that the facts of Film Recovery constituted an intentional tort. See Travis, supra at 177, 551 N.W.2d 132.
Professor Larson stated the material facts as follows:
"[T]he fumes ... were continuously operative, and the employer knew it.... The exposure to fumes did in fact occur. The only possible "unknown" might have been the effect of inhaling the fumes, but this unknown was removed by the plain warning on the package. The hiring of only workers who could not read warning labels confirms that the employer wanted those employees to continue to inhale these and suffer these known consequences. A court could well say that this amounted to intending the injury." [Travis, supra at 178, 551 N.W.2d 132, quoting 2A Larson, Workmen's Compensation, § 68.15(e), pp. 13-105 to 13-106.]
Returning to the facts in the case at bar, the defendant employer knew that dangerous fumes were being emitted from the stacks. He knew that Darl Williams had a liver condition that necessitated he not be exposed to the fumes. Defendant knew that whenever a wind arose from the west or northwest, people inside the building *81 would be exposed to the fumes. Despite this knowledge, the employer told Williams to work in the building. Williams' exposure to the fumes was certain to occur, much like the exposure the non-English speaking workers were subjected to in the Film Recovery case. The exposure was certain to injure plaintiff.
The question whether an intentional tort has been alleged is one of law for the trial court. Whether the facts are as plaintiff alleges is a jury question. See Travis, supra at 188, 551 N.W.2d 132. Here, the Court of Appeals failed to view the evidence in a light most favorable to Williams. Properly viewed, the proof plaintiff presented was sufficient for the jury to conclude that the manager knew plaintiff's injury was "certain to occur" and wilfully disregarded that knowledge. On the basis of the foregoing, I would reverse the judgment of the Court of Appeals and reinstate the jury verdict.
CORRIGAN, J., concurs and states as follows:
Plaintiff alleged that defendant, his employer, intentionally exposed him to toxic fumes that injured his liver and brain. Following a jury verdict for plaintiff, the trial court denied defendant's motion for judgment notwithstanding the verdict. The Court of Appeals reversed, relying on Travis v. Dreis & Krump Mfg. Co., 453 Mich. 149, 551 N.W.2d 132 (1996). It ruled that plaintiff's work-related injuries did not fall within the intentional tort exception to the exclusive remedy provision of the Worker's Disability Compensation Act, M.C.L. § 418.131(1); MSA 17.237(131)(1). Williams v. Organic Chemicals, Inc, unpublished opinion per curiam of the Court of Appeals, issued May 30, 1997 (Docket Nos. 171229, 176861, 177052).
The proofs revealed that as plaintiff was operating an indoor reactor, a westerly wind blew chemical fumes emitted from the reactor's exhaust stack back into the building, causing plaintiff's injuries. Viewing the evidence in the light most favorable to plaintiff, the Court of Appeals noted that plaintiff's plant manager knew that plaintiff's liver condition required him to avoid exposure to chemical vapors. Although the manager allowed plaintiff to operate a reactor that could "potentially" expose plaintiff to chlorinated solvent vapors, the reactor had never previously malfunctioned or caused the discharge of noxious fumes before the fumes backed up into the plant. Further, plaintiff presented no evidence that defendant knew the wind would be blowing from the west, causing a backup of fumes into the plant.
The Court of Appeals rejected plaintiff's reliance on evidence that defendant knew or should have known that the reactor's exhaust stack was too short, that it lacked a carbon filter, and that the building walls were porous sheet metal, thus permitting westerly winds to force vapors exiting the stack back into the building through the walls. This evidence established, at most, negligence or gross negligence. It did not, the Court of Appeals held, meet the Travis intentional tort standard.
This Court then remanded the case to the Court of Appeals to address whether evidence of an incident two days earlier in which noxious fumes had filled the building affected its analysis. Williams v. Amerisure, 458 Mich. 867, 586 N.W.2d 400 (1998). On remand, the Court of Appeals concluded that the prior incident did not affect its analysis. The two incidents were dissimilar. In the prior incident, another employee had tried to "blow" chemicals into the reactor from another tank in another building, thus causing the building to fill with fumes because of a lack of ventilation on the reactor. By contrast, plaintiff's exposure allegedly occurred because the exhaust stack was too short and westerly winds had blown fumes from the stack back into the building.
Our dissenting colleague opines that defendant had the requisite knowledge because a manager admitted that he knew *82 the stack would emit fumes and that he asked plaintiff to work on the reactor despite knowing of his liver condition. She concludes that defendant actually knew about the danger, knew that an injury was certain to occur, and then willfully disregarded that knowledge.
Justice Kelly equates knowledge of the danger with actual knowledge that an injury was certain to occur, contrary to the Travis standard. An allegation that the employer should have known, or had reason to believe, that an injury would occur is insufficient. Id., p. 173, 551 N.W.2d 132. "When an injury is `certain' to occur, no doubt exists with regard to whether it will occur. Thus, the laws of probability, which set forth the odds that something will occur, play no part in determining the certainty of injury." Id., p. 174, 551 N.W.2d 132. Further, it is not enough for the employer to know that a dangerous condition exists. Rather, the employer must be aware that injury is certain to occur. Id., p. 176, 551 N.W.2d 132.
The evidence cited in dissent establishes, at most, "mere negligence, that is, a failure to act to protect a person who might foreseeably be injured from an appreciable risk of harm." Id., p. 179, 551 N.W.2d 132. Plaintiff's liver condition made him susceptible to injury if exposed to fumes. Defendant's knowledge of plaintiff's susceptibility to injury is not actual knowledge that an injury is certain to occur. Similarly, evidence that the reactor's exhaust stack was too short and lacked a carbon filter, and that the building's walls were porous sheet metal, proved only that defendant failed to protect plaintiff from an appreciable risk of harm.[1] The evidence did not show that defendant actually knew that fumes emitted from the stack would be blown by a westerly wind into the building and injure plaintiff.[2]
*83 Accordingly, the Court of Appeals properly concluded that plaintiff's proofs at trial did not satisfy the Travis intentional tort standard.
MICHAEL F. CAVANAGH, J., states as follows:
I concur with the dissenting statement of Justice Kelly in this matter. I do so separately only to comment on the relatively recent practice of this Court's majority to, with increasing frequency, delegate to one or another of its members the task of responding to any dissent and explaining why a denial of leave is justified in a particular case.
In 1961, Justice Black, dissenting from the majority believing it "interesting" that the United States Supreme Court denied certiorari in a particular case, stated that "it has not as yet come to pass that denial of an application for certiorari or appeal [to this Court] amounts to another kind of stare decisis, `conclusive' or otherwise." Williams v. Detroit, 364 Mich. 231, 288, 111 N.W.2d 1 (1961). Justice Black would be surprised that some twenty-nine years later, it may come to pass that denial of leave to appeal to this Court could become another kind of stare decisis, just as he feared.
Traditionally, a court's refusal to hear a discretionary appeal meant nothing other than that the court would not hear that case. As Justice Holmes wrote for a unanimous Court, "[t]he denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times." United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361 (1923). Michigan has followed a similar rule, stating that a denial of leave to appeal "means that the Supreme Court expresses no present view with respect to the legal questions dealt with in the opinion of the Court of Appeals." Frishett v. State Farm Mut. Automobile Ins. Co., 378 Mich. 733 (1966).[1]
Sundry reasons cause the Court to take this view of denials of leave to appeal. The reasons causing the United States Supreme Court to take a similar view were capably summarized by Justice Frankfurter, and apply equally to our Court:
The sole significance of such denial of a petition for writ of certiorari need not be elucidated to those versed in the Court's procedures. It simply means that fewer than four members of the Court deemed it desirable to review a decision of the lower court as a matter of "sound judicial discretion." ... A variety of considerations underlie denials of the writ, and as to the same petition different reasons may lead different Justices to the same result.... Narrowly technical reasons may lead to denials. Review may be sought too late; the judgment of the lower court may not be final... A decision may satisfy all [the] technical requirements and yet may commend itself for review to fewer than four members of the Court. Pertinent considerations of judicial policy here come into play. A case may raise an important question but the record may be cloudy. It may be desirable to *84 have different aspects of an issue further illumined by the lower courts. Wise adjudication has its own time for ripening. [Maryland v. Baltimore Radio Show, 338 U.S. 912, 917-918, 70 S.Ct. 252, 94 L.Ed. 562 (1950) (citation omitted).]
Further, this Court has recognized that denials of leave to appeal have no precedential value by incorporating this command into our rules of practice and procedure. In them, we provide:
The reasons for denying leave to appeal, required by Const. 1963, art. 6,§ 6, and filed in the clerk's office, are not to be published, and are not to be regarded as precedent. [MCR 7.321(4).]
Despite this, justices of this Court have developed the practice of expressing views on the merits of Court of Appeals opinions or the demerit of any dissent, and attaching those views to their votes to deny leave to appeal. This practice not only flies in the face of the rules this Court has long followed, but it encourages the bench and bar to treat these statements as authority. It is true enough that such expressions are not controlling authority, because opinions not signed by a majority are not binding under stare decisis. People v. Gahan, 456 Mich. 264, 274, 571 N.W.2d 503 (1997). Nonetheless, they will doubtless be used as persuasive authority in the lower courts, because even nonbinding statements from this Court are accorded deference by the lower courts. See People v. Brashier, 197 Mich.App. 672, 678, 496 N.W.2d 385 (1992); see also People v. Emmerich, 175 Mich. App. 283, 286, 437 N.W.2d 30 (1989) (following the three-justice opinion in People v. Howell, 396 Mich. 16, 238 N.W.2d 148 [1976]). Thus, it would come to pass that a denial of leave to appeal could otherwise become stare decisis.
Indeed, not only would attorneys in future factually similar cases be remiss if they failed to employ these statements as authority regarding the merits of the Court of Appeals decision, but they may be bound to advise their clients on the basis of them. An attorney's duty of care to a client requires that the attorney must possess knowledge of plain and elementary principles of law, but the duty does not stop there. In unsettled areas of law, including those areas on which this Court, as a Court, has not commented, attorneys have an obligation to do reasonable research to ascertain relevant legal principles and authorities so that they can instruct their clients. See Smith v. Lewis, 13 Cal.3d 349, 358-359, 118 Cal.Rptr. 621, 530 P.2d 589 (1975) (otherwise overruled, In re Marriage of Brown, 15 Cal.3d 838, 851, 126 Cal.Rptr. 633, 544 P.2d 561 [1976]). Thus, an attorney who fails to consider these statements when advising a client would be providing less than complete services to that client, and may be failing to fulfill a legal duty.
The rule that a denial of leave has no precedential value has long been a part of Michigan law, and has served us well. With each statement explaining that denial of leave in a particular case is reasonable, the members of this Court chip away at that rule. Each time a member of this Court finds it necessary to explain the reasonableness of denying leave, whether leave was denied because the record was cloudy or as a matter of judicial policy, or for any other reason, the bench and bar will have reason to rely upon that denial as having legal significance.[2] This practice *85 undermines years of this Court's holdings and its rules of practice and procedure, and will work a fundamental change in the way denials of leave are viewed by the legal community. Because the previous practice of simply denying leave, without the need for any member of this Court to address the merits or elaborate any further than the Court's own order stating that it is not persuaded to review the questions presented, has been practical and has not implied that this Court has taken a view on the merits of the cases denied leave, I would retain it. The new practice suggests that a denial of leave is otherwise stare decisis, and we would fool only ourselves if we believed that the bench and bar will find it merely "interesting."
YOUNG, JR., J., states as follows:
Justice Cavanagh's statement does not address the merits of this application for leave, that duty having been relegated to Justice Kelly. In order to provide a context for the public, I feel compelled to respond.
It is, of course, the prerogative of any justice to issue a statement dissenting from any action taken by this Court. By the same token, it would seem to be an unassailable proposition that any justice aggrieved by a dissenting statement should enjoy the same prerogative. These expressions of dissenting or concurring opinion by individual justices are no more than that and have no precedential value whatsoever. Justice Cavanagh's incitement to the contrary, I vigorously disagree with his suggestion that the bench or bar should in any way rely upon or use the dissenting or concurring statement of a justice as precedent.
As I understand Justice Cavanagh's dissent, he is disturbed by the increasing incidence of concurring statements filed to rebut dissenting statements authored by Justice Kelly and himself. In an institution that is compelled to explain its actions, this seems a truly perverse basis for dissent. Dissenting statements authored by Justices Cavanagh and Kelly have become an invariable feature of the orders issued by this Court since January 1999. Surely, Justice Cavanagh would not dream of attempting to silence his colleagues who take exception to those statements. Therefore, I conclude that there must be some other, unstated, motive for his latest offering.
NOTES
[1] Contrary to Justice Corrigan's assertion, it was not necessary for the co-worker to explain how Gene Gray knew of the plant's susceptibility to fume back-drafts in westerly or northwesterly winds conditions. The defendant never objected to this testimony. Also, the co-worker's testimony established that the plant manager knew of the wind condition. Justice Corrigan also ignores the fact that the plaintiff's proofs did not rely on the co-worker's testimony exclusively.
[2] Justice Corrigan's concurring statement focuses on nonmaterial facts and illustrates her failure to view material facts in a light most favorable to the plaintiff. The plaintiff's work area constituted the continuously operative dangerous condition. The work area inside the building contained a reactor that was not fitted with a scrubber. Without the scrubber, dangerous fumes escaped to the outside of the building. Proffered testimony from defendant's employee established that west or northwesterly winds would always blow the harmful fumes back into the building, and that Gene Gray knew of this common condition. Therefore, contrary to Justice Corrigan's assertion, the proofs did establish that defendant knew of a continuously operative dangerous condition.
[1] We question, however, whether these facts would even establish mere negligence, since defendant provided plaintiff with a respirator mask that could have protected him from the noxious fumes.
[2] The dissent further contends liability may be established under the "continuously operative dangerous condition" doctrine:

When an employer subjects an employee to a continuously operative dangerous condition that it knows will cause an injury, yet refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured, a factfinder may conclude that the employer had knowledge that an injury is certain to occur. [Travis, supra, p. 178, 551 N.W.2d 132.]
The facts here do not establish that defendant knew of a continuously operative dangerous condition. The dissent relies on the prior incident involving a co-worker, discussed supra. As noted by the Court of Appeals, however, the conditions that led to the instant exposure were not involved in the prior incident. Plaintiff has presented no evidence of a prior occasion in which toxic fumes were emitted from the exhaust stack and blown back into the building, causing injury. This case is thus devoid of proofs to establish that defendant knew of a continuously operative dangerous condition.
Further, the dissent fails to recognize that Golec v. Metal Exchange Corp., the companion case to Travis, supra, is distinguishable. In Golec, the plaintiff was injured by an explosion while loading scrap metal into a furnace. The employer had actual knowledge of prior explosions. We concluded a genuine issue of material fact existed regarding actual knowledge under the continuously operative dangerous condition theory. By contrast, plaintiff here has presented no facts to establish such knowledge.
Justice Kelly further opines that defendant's failure to install a "fume scrubber" on the reactor created a continually operative dangerous condition. The use of such a scrubber would have made it unnecessary to send the fumes outside where they could be blown by a westerly or northwesterly wind back into the building, Justice Kelly argues.
These facts do not establish that defendant knew a continually operative dangerous condition existed and that it would cause injury. Travis, supra, p. 178, 551 N.W.2d 132. While the failure to install a scrubber may be negligent, it does not establish that defendant knew the lack of a scrubber would cause the emitted fumes to reenter the building and injure plaintiff. Justice Kelly again relies on the testimony of plaintiff's co-worker who was involved in the prior, dissimilar incident. The co-worker asserted that the plant manager knew that a westerly or northwesterly wind would blow fumes back into the plant. The co-worker offered no explanation for this assertion, however, other than claiming that the condition was "common knowledge." In any event, no similar series of events had ever caused injury, and defendant provided respirator masks for employees to wear in the event of exposure. The co-worker's testimony therefore fails to establish that the plant manager actually knew "that an injury would follow from what the employer deliberately did or did not do." Id., p. 174, 551 N.W.2d 132.
[1] This rule has long been a part of our state's law, and has been invoked with some regularity. See Malooly v. York Heating & Ventilating Corp., 270 Mich. 240, 247, 258 N.W. 622 (1935) ("the denial of the writ of certiorari is not equivalent of an affirmation of the decree sought to be reviewed"); Great Lakes Realty Corp. v. Peters, 336 Mich. 325, 328, 57 N.W.2d 901 (1953); State Bar v. Brotherhood of RR Trainmen, 383 Mich. 201, 208, 174 N.W.2d 811 (1970) rev'd on other grounds sub nom United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); Tebo v. Havlik, 418 Mich. 350, 363, n. 2, 343 N.W.2d 181 (1984) ("A denial of leave to appeal has no precedential value").
[2] Dissenting statements are also attached to denials of leave, but they do not pose the same risk of becoming authority that concurrences to denials pose. Though neither are signed by a majority of the Court, there is no chance that the reasoning of a dissent will be relied upon by lower courts because whatever the merits of the dissenting statement, the position it advocated was not adopted by the Court. Also, then, dissenting statements are unaffected by MCR 7.321.

In contrast, the reasoning in a concurrence explains the action taken by the Court, regardless of how many members of the Court actually held the view advocated by the concurrence. Therefore, lower courts and the bar, in deference to this Court and in the never-ending search for legal authority to support a case, will likely begin to use concurrences as authoritative statements of law from this Court.